**ROBSON LINK & COMPANY, a corporation of Florida, v. LEEDY WHEELER & COMPANY, a corporation of Florida.**

18 So. (2nd) 523                                    June Term, 1944
June 13, 1944                                            En Banc
Rehearing denied June 28, 1944

*Kurtz, Reed, Sappenfield & Cooper,* for appellant.
*Maguire, Voorhis & Wells,* for appellee.

BROWN, J.:

The appellant here was plaintiff in the court below and the appellee here was defendant. The appeal is taken from a final decree of the circuit court in and for Dade County dismissing the bill of complaint. The relief prayed for in the bill was the rescission of a transaction between the plaintiff and defendant by which the defendant traded twenty one bonds of the par value of one thousand dollars each of the Public Gas Company to the plaintiff in exchange for thirty Dunedin municipal bonds of the par value of Thirty thousand dollars. The bill prayed that the trade be rescinded and the parties placed in the position they occupied immediately prior to the exchange, on the ground that plaintiff had been induced to make the trade by certain false representations on the part of the defendant.

Both parties were corporations engaged in the purchase and sale of securities and specalizing in municipal bonds; and, according to the evidence, both parties enjoyed a good reputation for honesty and square dealing. The main office of the plaintiff Company was located in Miami while that of the defendant was located in Orlando.

The Public Gas Company, a Florida corporation whose main office and place of business was located in Miami, commenced business in 1940. Its business was the distribution of propane gas, some times referred to as "bottled gas." It began "from scratch," with no customers accounts. These had to be secured by salesmanship or purchase from other concerns. Messrs. Ruskin & Orovitz, who had had successful experience in other lines of business, owned the controlling interest. Some time in the latter part of 1941 the Public Gas Company needed additional financing and desired to issue $65,000.00 of first mortgage bonds. After investigation, the defendant, Leedy Wheeler & Company, agreed to underwrite this bond issue; that is, they agreed to purchase the entire bond issue at 95 which amounted to giving them a commission of $3250.00. The officers of the gas company also agreed to deliver from their own holdings twenty-five per cent of the common stock of the Gas Company to defendant. The legal expenses incurred by the Public Gas Company amounted to $500.00 making the cost of the financing $3750.00.

Some weeks after defendant had underwritten and acquired these bonds, its representative in Miami approached the plaintiff with the suggestion that plaintiff purchase all or a portion of said bonds. This suggestion was declined at that time. Later on during the month of March, 1942, Howard S. Wheeler, First Vice President of the defendant corporation, approached the plaintiff again with regard to acquiring some of the bonds, and as a result of these later negotiations the exchange of bonds above referred to was affected on or about April 7, 1942. Some weeks prior to this, plaintiff had made inquiry as to the financial status and business management of the Public Gas Company and defendant's representative had delivered to plaintiff a certain "pro forma" financial

statement of the Public Gas Company as of the date of November 1, 1941 (referred to in the briefs as "pro forma statement No. 1"), and had expressed his high opinion of the ability and character of the management of the Gas Company, and also stated that while the Company had about broken even during its first year, it was now making some money and that its prospects were good. Attached to this financial statement was a prospectus. The officers of the plaintiff company, Messrs. Robson & Link, had had dealings with Leedy, Wheeler & Company before and had confidence in their ability and integrity. Furthermore, they knew that the defendant corporation had bought these bonds at 95. Manifestly this pro forma statement and attached prospectus were given by the defendant's representative to the plaintiff for the purpose of effecting the exchange, which later took place, and both officers of the plaintiff company testified that they relied upon the accuracy of these documents. In addition to this, one of the officers of the defendant company wrote Mr. George Robson, one of the officers of the plaintiff company, a letter on March 9, 1942, reading as follows:

"Dear George:

"We have received operating figures from the Public Gas Company covering the last four months, and I thought you might be interested in them. These are as follows:

|          | Nov. 1941 | Dec. 1941 | Jan. 1942 | Feb. 1942 | Total      |
|----------|-----------|-----------|-----------|-----------|------------|
| Receipts | $7312.89  | $6755.66  | $8026.14  | $7534.10  | $29,628.79 |
| Expenses | 5599.52   | 6266.57   | 7263.16   | 6146.40   | 25,275.65  |
| Net      | 1713.37   | 489.09    | 762.98    | 1387.70   | 4,353.14   |

"The figures for expenses include interest charges as well as amortization of principal.

"The expense figures fluctuate from month to month, because certain items may be heavier in one month than another, for example, heavy freight charges may be billed in one month, leaving smaller charges for the succeeding month. The same is true of supplies.

"The net earnings for the past four months would indicate annual net operating profits of about $13,000.00 which isn't bad.

"I thought you might be interested in the above."

Before the exchange of the securities took place, the Miami representative of the defendant company took Mr. Robson out to the plant of the Public Gas Company and he was shown the entire plant, and Mr. Gier, the vice president and manager, was told to give Mr. Robson any information that he desired regarding the operation of the Company. Mr. Robson inspected the plant, but did not examine the books of the Company or ask any questions as to its financial condition.

Plaintiff laid some stress upon the failure of Mr. Robson to make his own investigation of the books of the Company or ask Mr. Gier questions about the then financial condition of the company, but we do not attach any great importance to this incident. Robson had already been furnished a copy of the pro forma statement No. 1, as well as a copy of the prospectus, upon which he contends he had the right to rely so far as the financial condition of the company as of October 31, 1941 was concerned, and the letter which had been written him by defendant showed that the company was making money on its operations during the latter part of 1941 and the first two or three months of 1942, and Robson testified that he relied upon the correctness of the showing thus made as to the financial condition and progress of the company. Furthermore, the Miami representative of the defendant company had stated to the plaintiff that the Public Gas Company was in sound financial condition; that its business management was honest and efficient and that its financial condition when the bonds were issued about December 1, 1941, was approximately in accordance with the pro forma statement which he furnished to plaintiff. After the exchange of bonds had taken place, plaintiff received, in June 1942, the interim audit of the gas company as of April 30, 1942. After examining same plaintiff demanded from defendant's Miami representative an explanation and further information as to the financial status of the Gas Company

when the bonds were issued. In response to this demand plaintiff received additional information which showed that there had been omitted from pro forma financial statement No. 1, therefore furnished to them, certain items of liabilities amounting to $16,239.46. They also discovered that there had been a net operating loss for the first year of operations, ending October 31, 1941, of $24,530.22. One item of this additional information consisted of a pro forma statement, referred to in the brief as "pro forma statement No. 2," which statement was in fact the first pro forma statement prepared but which had not been furnished to plaintiff. This pro forma statement showed the liabilities and net operating loss above referred to. A pro forma statement is one which gives retroactive effect to new financing. They also discovered that there had been omitted from the copy of the prospectus furnished to them two paragraphs, one of which disclosed the net loss from operations for the first year of $24,530.22. This additional information, on its face, showed a less desirable financial condition than that shown by the pro forma statement upon which plaintiff relied when they agreed to the exchange of bonds and indicated that the bonds were, as alleged in the bill, considerably less in value than they had been led to believe by the original pro forma statement furnished them. After discovering these discrepancies, plaintiff called in defendant's representative and asked him to explain them, which he was not able to do to their satisfaction. They then wrote a letter to defendant demanding that the exchange of securities be reversed and that the parties be placed in the position they occupied before the exchange took place. This request was refused. The bill alleges that plaintiff still holds all shares of the gas company's stock which they had received in the exchange and offered to return them to the defendant should rescission be granted and alleged that if the defendants did not then hold the Dunedin bonds they received in the exchange, they are readily available in the open market and that defendant could procure the same and that the parties were in a position to place each other in the position they occupied before the exchange. At the time the testimony was taken in this

case, it showed that Dunedin bonds could then be purchased for slightly less than the market price at the time the securities were exchanged.

On or about the first of December, 1941, the pro forma statement prepared by Gier and the prospectus prepared by the Miami representative of the defendant, was received by the defendant in Orlando and forwarded by them to the Florida Securities Commission. A letter accompanying them was written by P. L. Pierce of Leedy Wheeler & Company. This "pro forma balance sheet" was as follows:

### THE PUBLIC GAS COMPANY MIAMI, FLORIDA

Pro-Forma Balance Sheet, giving effect to the present financing;

(Based on certified year-end audit of October 31, 1941)
Assets:

| | | |
|---|---|---|
| Cash | $20,813.11 | |
| Inventories (gas and appliances) | 9,880.33 | |
| Accounts receivable (net) | 8,188.25 | |
| Total Current Assets | | $ 38,881.69 |
| Fixed Assets (net) | $68,297.33 | |
| Other Assets | 5,277.22 | |
| Total Fixed & Other Assets | | 73,574.55 |
| Total Assets | | $112,456.24 |

Liabilities:

| | | |
|---|---|---|
| Notes Payable (Unsecured) (Payable monthly, matures 9-23-42 | $ 4,700.00 | |
| Customers Deposits | 5,647.00 | $ 10,347.00 |
| Loans Payable (Officers unsecured) | 3,781.18 | |
| Salaries Payable (Officers unsecured) | 3,998.28 | |
| Total Liabilities | | $18,136.46 |

| | | |
|---|---:|---:|
| Bonded Indebtedness | 65,000.00 | |
| Cost of Financing | 3,750.00 | |
| Capital Structure: | | |
| Preferred Stock issued | 37,600.00 | |
| Common Stock | 20,000.00 | |
| Operating Loss 10/31/41 | 24,530.22 | $ 33,069.78 |
| | | $112,456.24 |

. . . .

I hereby certify that the above is a true pro-forma profected statement of the Public Gas Co., of Miami, Florida, based upon the certified audit of Abess & Costar, C.P.A. as of October 31, 1941.

Date: November 30, 1941     (Signed) John Gier
                                   Vice President
                                   The Public Gas Co.

The foregoing document was not delivered to plaintiff until some three months after the exchange of securities had taken place. The pro forma balance sheet which was delivered to plaintiff and on which they relied in acquiring the bonds, plaintiff's Exhibit No. 1, is as follows:

### FINANCIAL STATEMENT
Pro-Forma Balance Sheet, giving effect
to present financing as of 11/1/41

#### ASSETS

| | | |
|---|---:|---:|
| Cash on Hand | $ 200.00 | |
| Cash in Banks | 20,613.11 | $ 20,813.11 |
| Accounts Receivable | $8,992.40 | |
| Less: Reserve | 804.15 | 8,188.25 |
| Inventories | | 9,880.33 |
| Fixed Assets | $75,751.02 | |
| Less: Reserve for Depreciation | 7,453.69 | 68,297.33 |
| Other Assets | | 5,277.22 |
| **TOTAL ASSETS** | | $112,456.24 |

## LIABILITIES

| | | |
|---|---:|---:|
| Customers Deposits | | $ 5,647.00 |
| First Mortgage Bonds | | 65,000.00 |
| Net Capital Account | | |
|   Preferred Stock | $35,222.33 | |
|   Common Stock | 14,040.60 | |
| | $49,262.93 | |
| Less: Reserve for Depreciation | 7,453.69 | 41,809.24 |
| **TOTAL LIABILITIES** | | $112,456.24 |

Furthermore, plaintiff alleges that it was further deceived because two paragraphs which were contained in the first prospectus fixed with the Florida Securities Commission were omitted from the copy of the prospectus furnished to plaintiff by defendants Miami representative prior to the exchange of the bonds. In his testimony, this representative stated that he did not know who omitted those two paragraphs. The omitted paragraphs commented on the first year's operating loss of $24,530.22, shown by the first statement but not shown by the statement given plaintiff, and attempted to show that this was small considering that it represented the initial expense of starting the operation of the business, such as the employment of numerous salesmen to secure customers, some 1500 accounts being secured. There was testimony introduced in the case showing that these accounts were worth at least $20.00 each, or $30,000.00, which, if it had been included as an asset, would have more than canceled out the operating loss for the first year. The evidence also shows that about $7,400.00 of this operating loss consisted of a very liberal estimate of depreciation in the value of the physical assets for one year, and that the real operating loss was about $17,000.00, which was more than offset by the value of the customer's accounts secured. So the "operating loss" was not so bad as it looked.

The audit made by Abess & Costar, showing in detail the condition of the Gas Company's business as of October

31, 1941, was not delivered to plaintiff until some time after the exchange of bonds, when the interim audit of April 30, 1942, reached them and shocked them into demanding further information.

The deposition of Howard S. Wheeler explains why there appears to be two differing pro forma statements. Some time between December 1st and 5th, 1941, the first pro forma statement prepared by Gier and the prospectus prepared by the defendant's Miami representative came to the attention of Wheeler. He found that this pro forma statement indicated that a note of $4,700.00, salaries due to officers of $3,988.28, and loans to officers in the amount of $3,791.18, totalling $12,489.46, were to be paid out of the proceeds of the bonds, because these items appeared in the statement as accounts payable. This, he testified, was contrary to the agreement between the defendant underwriter and the Gas Company, it having been understood between them that these items were to be capitalized; i.e., the Gas Company was to issue preferred stock in payment of same. Wheeler thereupon telephoned Gier that the statement was not in accordance with the agreement, and, at Wheeler's suggestion, Gier conferred with Ruskin & Orovitz, the two owners of the Public Gas Company, who verified what Wheeler had said; whereupon Gier phoned Wheeler that the items would be capitalized and the pro forma statements changed accordingly, which latter was done, and it was this second statement which was given to plaintiff. During this phone conversation Wheeler told Gier that in his opinion approximately $17,000.00 of the deficit for the first year was caused by the expense of securing new accounts, a non-recurring expense, and that it was in fact a capital expenditure and should be charged out of the capital account. He also told Gier that the depreciation item of $7,463.69 was not properly an operating cost. Wheeler's position in regard to both these items appears to have been a reasonable one. After some discussion Gier replied that he agreed with Wheeler and that the pro forma statement would also be changed in that particular; whereupon he drew a new pro forma statement, certified to it and sent it to Wheeler, and it was this

pro forma statement which the defendant's Miami representative gave to plaintiffs some weeks later.

Wheeler also told Gier that the prospectus prepared by defendant's Miami representative was too long and complicated, that nobody would take time to read it, and so Wheeler prepared one of his own and later enclosed the new pro forma statement by Gier and the rewritten prospectus along with his application to the Florida Securities Commission for the registration of the Public Gas Company's bonds, under date of December 9, 1941. The prospectus written by Wheeler was labeled "Preliminary Circular" and contains the second pro forma statement prepared by Gier above referred to. All the papers which had previously been forwarded to Tallahassee, including the first prospectus and pro forma statement, were left on file there, and shortly after these later papers were filed the Florida Securities Commission issued its certificate of the registration of the bonds.

There is some testimony by Gier and accountant Abess to the effect that both pro forma statements are correct, that both were founded upon the audit made by Abess & Costar, and both showed the same total liabilities and total assets, and that the net capital figured out substantially the same on both statements, but the fact remains that the three items of liability totaling $12,489.46, and the operating loss of $24,530.22 according to Gier's first pro forma statement, are not specified in the second statement prepared by Gier, which was the one delivered to plainitiff to induce it to exchange the bonds. But defendant contends that the net capital is shown to be the same by both statements, because in the second statement the items to be capitalized had been added to the capital account, and that the cost of the bond issue, $3,750.00, and approximately $17,000.00 of the operating deficit, had been subtracted from the capital account, a balance struck, and from this had been subtracted the depreciation item of $7,453.69, leaving a net capital account of $41,809.24. But this capitalizing of the liability and the aperating loss, while agreed to by Ruskin and Orovitz, the owners of the Gas Company, was never carried out.

Thus the statement given plaintiff was not actually true.

It was indeed materially misleading. While this matter of the capitalization of the liabilities and the operating loss, which Wheeler directed to be reflected in the statement, was so directed in good faith, based upon his prior agreement with Ruskin and Orovitz, and their subsequent re-affirmation thereof, which he believed they would carry out, the defendant Company did not follow the matter up to see that this was actually done. While the failure of the owners of the Gas Company to carry out their agreement with Wheeler is not evidence of fraudulent intent on his part or on the part of his company, the fact remains that the change thus made in the pro forma statement was not in accordance with the *existing* facts and later on resulted in concealing from plaintiff sizable items of liability and operating loss, which had not been actually capitalized as Wheeler assumed they would be, and was calculated to and did mislead the plaintiff company. Both Robson and Link so testified, and stated that if they had known about this operating loss and these omitted items of liability, they would never have agreed to the exchange of bonds. Major Wheeler, who had later entered the armed services before this suit was begun, stated in his deposition, taken December 5, 1942, that he did not learn of the Gas Company's failure to capitalize the items referred to until he read the bill of complaint in this case, which was filed August 14, 1942.

One other matter might be referred to. Plaintiff had been advised that defendant would get a five per cent commission on the bond issue and that the legal expenses amounted to $500.00 but when the interim audit of April 30, 1942, came out and was made available to the plaintiff in June, it was discovered that the total cash on hand had dwindled down to $190.00, and that the total bond expense amounted to $8,790.66. It was understood that defendant was to receive twenty five per cent of the capital stock of the Company but this stock was not to be paid for by the Public Gas Co., it was to be contributed by the individual stockholders without expense to the company. This is shown by Wheeler's testimony. Instead of this stock being contributed by individual stockholders of the Gas Company to the defendant, it was

purchased by the Gas Company for delivery to the defendant with the assets of the Gas Company, increasing the bond expense from $3750.00 to $8790.66, decreasing thus the assets behind the bonds in the sum of $5,040.66. Wheeler testified that he did not know about this either until he read the bill of complaint. It is argued in behalf of appellee here, defendant in the court below, that plaintiff has forfeited its right to a rescission of the exchange of bonds because it had received or collected dividends on the Gas Company's bonds since the exchange was made. As the defendant had refused to rescind and plaintiff was compelled to bring suit to obtain a recission, it was plaintiff's duty to protect and preserve pendente lite the securities it received in the exchange including the collection of dividends. Plaintiff in its bill stated that it was in a position to account for such interest to the defendant if and when a rescission is ordered by the court. If the plaintiff below was entitled to rescission, the court below could have so framed its decree as to have placed each of the parties in the position they occupied immediately prior to the exchange of the bonds.

In his opinion and decree, the chancellor called attention to the contentions of the defendant, one of which was that the information contained in the pro forma statement furnished by them to plaintiff was based upon information furnished by the issuing company and that at no time had the defendant warranted or guaranteed the financial condition of the gas company, but the statements made by the representatives of the defendant merely reflected their opinion of the financial stability of the issuing company. The defendant contended in the court below, and here, that the sources of information were equally available to both parties. The chancellor's general view of the case is tersely stated in his decree in two paragraphs reading as follows:

"The sole and only question to be determined is whether or not under all the circumstances the defendant is guilty of making materal misrepresentation of fact upon which the plaintiff acted to its injury. The securities business as it is operated today is a highly technical one and requires constant and unflagging attention to all factors which may, or

may not, determine the value of the commodity sought to be sold. Those engaged in such business must necessarily perforce become expert in analyzing the financial condition of any company or governmental body which issues its obligations for sale to the general public; like any other business a great deal of puffing is used by those who wish to dispose of their wares. However, regardless of how much confidence may be placed in a company, either as underwriters or handling securities for resale, those who intend to survive are compelled to rely not upon representation, but upon information which they have secured; either through experience or investigation. It is conceded the defendant has enjoyed a good reputation in the securities world and with the general public, nevertheless it does not appear to be the custom of those engaged in such business to rely upon the reputation of an individual or a firm in the offering of securities, either for private or public sale, nor was this the situation in the present case. Various negotiations were carried on with the intention of discovering whether or not the bonds were as represented. At least two trips to the office and plant of the issuing company were made by officers of the plaintiff. True the so-called "pro forma statement" disclosed a better financial condition of the Public Gas Company than was ascertained later, but even as to this expert accountants disagreed; the accountant witness for the plaintiff testified that the true financial condition of the company as subsequently disclosed revealed a good financial position, although not as attractive as the first.

"After a careful consideration of all the testimony it can not be said that any undue advantage was taken of the plaintiff by the defendant. Both have engaged in this particular type of business approximately the same length of time; both are of good repute, and are known to be well versed in the handling of securities. They were both dealing at arms length. Neither possessed a substantial advantage over the other."

But it must be remembered that no complaint was made by the plaintiff as to any misrepresentation as to the physical property of the Gas Company—its plant, etc., which plaintiff

had inspected. It must also be remembered that there was evidence adduced by plaintiff to the effect that where a reputable bond dealer underwrites and purchases an entire bond issue, it is not customary for other dealers, especially those who have had satisfactory dealings with him in the past, to go behind the statement of the financial condition of the issuing company furnished by such underwriter to ascertain by independent audit or investigation the substantial accuracy or truthfulness, vel non, of such statement.

As pointed out in what has already been said, the misrepresentation relied on by plaintiff as ground for rescission was a material one but was innocently made. The defendant, without any fraudulent intent, made the mistake of treating and representing that as done which ought to have been done by the Gas Company, and which they fully believed would be done, but which was not done. The result, however, in so far as the plaintiff was concerned, was the same as if there had been a deliberate intent to deceive and mislead plaintiff.

We have no precedent directly in point in this State— that is, where the facts are the same. We have many cases dealing with the general principles or rescission and cancellation. Quite a number of Florida cases are cited by counsel for appellee, and there are expressions in many of them which tend to support their view of the case. On the other hand there are some few expressions which tend to support appellant's view.

As we view the facts shown by this record, neither of the pro forma statements or balance sheets showed that the Gas Company was insolvent or in a dangerous financial condition. And the same might be said with reference to the two prospectuses. The first statement showed the heavy operations loss for the first year, but the first prospectus which accompanied it gave an apparently reasonable explanation of this item. The second pro forma balance sheet and "preliminary circular" omitted any showing of this operating loss, and also omitted any showing of certain items of liability which were shown by the first statement. This second statement undoubtedly made a more favorable and attractive showing as to the financial condition of the Gas Company and the

value and salability of its bonds than the first one, as one of the witnesses for defendant admitted. It was this second statement which was submitted to plaintiff and upon which it relied and acted. There was no fiduciary relationship existing between the parties, but, for the reasons already stated, plaintiff's officers had great confidence in defendant, the underwriter of the bonds, and accepted the statement tendered them as being at least substantially true and correct. We think plaintiff, and for that matter the Securities Commission, were justified in so accepting it. For the very reasons stated by the chancellor, as to the expert ability required to properly analyze the financial condition of industrial and other corporations and properly reflect it in a statement even when one is presented with a detailed audit of the business by good accountants, and the ability which is requisite to the proper analysis of such statements, it is important that a high standard of business ability should be possessed by those engaged in buying and selling bonds and stocks, and that a high standard of business ethics should be observed by dealers in such securities—not only for the protection of each other, but certainly for the protection of private investors—that portion of the general public which furnishes the large minority of ultimate purchasers.

The enactment of the law establishing the Florida Securities Commission, now Chapter 517, Fla. Stats. 1941, recognizes this principle of reasonable responsibility to the investing public, and makes it a part of the public policy of the State. And we think this public policy is extended by the statute to transactions between bond dealers, and is especially applicable where the seller is the underwriter of the bonds and is presumed to have made a thorough investigation of the issuing company. Thus, where, as here, a reputable underwriting bond dealer, innocently and without any intent to defraud, relying upon an agreement with the issuing company which is not kept, furnishes to a prospective bond purchaser a financial statement, pro forma or otherwise, purporting to show the financial condition of the issuing company, which statement is materially misleading, and the material misrepresentation thus innocently made is relied on

and acted upon by such prospective purchaser, who, though himself a bond dealer, does not know the real facts and who, with full confidence in the offerer, and in reliance upon such statement, purchases some of the bonds, and in so doing acts to his own detriment or injury, such purchaser is entitled to relief, when as here, he acts promptly upon discovering the true facts. The nature and character of the relief would.of course vary according to the facts of the particular case. In some cases, rescission might be the appropriate remedy; in others an action at law for damages might lie.

But appellee contends that the plaintiff below was not entitled to the relief it sought because it was negligent in that it could and should have made its own independent investigation; that no fiduciary relation existed, and the parties were dealing at arms length; that the sources of information were available to both parties; that the Gas Company's office and plant were located in Miami, where plaintiff's offices were located; that plaintiff knew that the pro forma statement given it was made by Gier and was based upon the audit made by Abess & Costar, certified public accountants, who were also located in Miami, and that furthermore all the information it needed could have been secured from the papers on file with the Securities Commission in Tallahassee. To support this contention appellee cites a number of Florida decisions, among them Glass v. Craig, 83 Fla. 408, 91 So. 332; Stokes v. Victory Land Co., 99 Fla. 795, 128 So. 408; Camardello v. Courtright, 126 Fla. 536, 171 So. 225; Peacock Hotel Co. v. Shipman, 103 Fla. 633, 138 So. 44; Geo. E. Sebring Co. v. Skinner, 100 Fla. 315, 129 So. 759; Byrd v. Smith, 114 Fla. 24, 152 So. 851; and Hirschman v. Hodges, 59 Fla. 517, 51 So. 550. These cases involved real estate transactions, and in our opinion are not quite in point here.

The last case cited, Hirschman v. Hodges, contains a very good statement of certain general principles applicable to that class of cases. Appellant quotes the following from the opinion by Mr. Justice HOCKER in that case, as follows:

"In 2 Pomeroy's Eq. Jur. (3rd ed.) Section 893 it is said: "If after a representation of fact, however positive, the party to whom it was made institutes an inquiry for himself, has

recourse to the proper means of obtaining information, and actually learns the real facts, he cannot claim to have relied upon the misrepresentation and to have been misled by it. Such claim would simply be untrue. The same result must plainly follow when, after the representation, the party receiving it has given to him a sufficient opportunity of examining into the real facts, when his attention is directed to the sources of information, and he commences or purports, or professes to commence, an investigation. The plainest motives of expediency and of justice require that he should be charged with all the knowledge which he might have obtained had he pursued the inquiry to the end with diligence and completeness. He cannot claim that he did not learn the truth, and that he was misled."

But in the same opinion, the following appears:

"This court, in Stephens v. Orman, 10 Fla. 9, has stated the law applicable to cases like the instant one. It is there said:

" 'It is well settled that a suppression of truth, or suggestion of what is not true, in some material point, will be ground for setting aside any contract. Again, concealment of a material fact by a party to a contract is ground for relief, where he had better opportunity to know than the other but where the facts lie equally open to the vendor and vendee, with equal opportunity of examination, and the vendee undertakes to examine for himself without relying upon the vendor's statements, it is no evidence of fraud that the vendor knew facts not known to the vendee, and does not make them known to him.'

" 'A misrepresentation by a vendor to be ground for a rescission of the contract, must be in reference to some material thing unknown to the vendee, either from not having examined or from want of opportunity to be informed, or from entire confidence reposed in the vendor, and his remedy must be pursued in good time after the injury is discovered. . . . It is a well established principle in equity that nothing but what is plainly injurious to good faith ought to be considered as a fraud sufficient to impeach a contract. . . . The mere fact that an agreement is improvident, is no

ground for setting it aside; it can only be avoided because of surprise, or mistake, want of freedom, undue influence, the suggestion of falsehood or the suppression of truth.' See Mizell Live Stock Co. v. J. J. McCaskill Co., decided here at the present term, and authorities there cited'."

While there does not seem to be any of our previous decisions where the facts are on all-fours with the facts of this case, some of our opinions contain statements of legal principles which support the views hereinabove set forth. Thus in the opinion in Langley v. Irons Land Dev. Co., 94 Fla. 1010, this Court quoted with approval the following from 9 C. J. 1169:

"According to the weight of authority, misrepresentation of material facts, although innocently made, if acted on by the other party to his detriment will constitute a sufficient ground for rescission and cancellation in equity. The real inquiry is not whether the party making the representation knew it to be false, but whether the other party believed it to be true and was misled by it in making the contract; and, whether the misrepresentation is made innocently or knowingly, the effect is the same. It is as conclusive a ground of relief in equity as a willful and false assertion, for it operates as a surprise and imposition on the other party, and in such case the party must be held to his representations."

And in Willis v. Fowler, 102 Fla. 35, 136 So. 358, in the course of the opinion it was said:

"We are not unmindful of the general rule that representations in regard to value are regarded as expressions of opinion on which the purchaser has no right to rely, and which afford no ground for rescission, especially where the parties are dealing at arms length and on equal terms. Glass v. Craig, 83 Fla. 408, 91 So. 332. But it has been held that where one of the parties to a contract of sale is in possession of exclusive or greatly superior knowledge of the value of the subject matter, as where an officer of a corporation, with full knowledge, makes a statement to a prospective purchaser of its stock, a mere member of the general public, as to what the stock is worth, his statement will be regarded as the statement of a matter of fact, rather than of opinion,

and if false and fraudulent, the sale may be rescinded." (citing authorities).

In Baxter v. Thompson, 134 Fla. 494, 184 So. 118, appellant contended, among other things, that the purchasers of the timber rights, who were the appellees, had not been prevented by appellant from making an independent investigation of the timber located on the land described in the contract. In the opinion this Court said:

"The timber pointed out by the defendant to the plaintiffs was located on lands not owned by the defendant, but plaintiffs entered into the contract and advanced the sum of $2,000.00 believing that they were obtaining the timber pointed out to them by the defendant. It is reasonable to assume that the defendant thought or believed he owned the land on which the disputed timber was located. Counsel for appellees in their brief state, 'We are of the opinion that the mistake of the defendant was an honest one." (Citing a number of our previous decisions.)

Counsel for appellant rely strongly on cases cited in an annotation in 73 A.L.R., commencing at page 1120. This annotation purports to cover cases of representations as to the value of corporate stock or other securities and also representations respecting the assets, etc., of the corporation, which indirectly relate to the value of the shares of securities. It appears therefrom that the vast weight of authorities in other jurisdictions uphold the contention of appellant, as well as the views hereinabove expressed.

It appears to be well settled that the purchaser's right to rescind a contract for the purchase of corporate stock or other securities on the ground of false representations does not necessarily depend upon a showing of actual knowledge of the falsity thereof by the party making the representation. One of the many cases cited is the case of Ogden Valley Trout & Reserve Co. v. Lewis (1912) 41 Utah, 183, 125 Pac. 687. In that case the Court said:

"In an action for a rescission, where the only consequence sought to be reached by the action is to rescind and to place the parties in status quo, a different rule prevails. Why should he who makes false representations be permitted to

profit by them, whether he knew they were false or not? Upon the other hand, why should the party who is deceived be bound by a contract based upon false representations, simply because he cannot prove that the other party to the contract knew the statements when made were false?"

In Black on Rescission and Cancellation, 2nd Ed. Section 102, it is said:

"An action at law for fraud in making false representations and a suit in equity for the rescission of a contract on the ground of misrepresentations are founded on distinct theories. The former is based on an intentional deceit, which of course includes a knowledge of the falsity of what is affirmed. But the latter is aimed at the undoing of a bargain which circumstances would render it inequitable to enforce and the restoration of the parties to the status quo, and this may be consistent even with entire innocence and ignorance on the part of the person making the misrepresentations, or with his belief in their truth. Where one induces another to enter into a contract with him by the positive assertion of a fact or state of facts, material to the transaction, which do not really exist, and the other relies thereon and is misled to his injury, the view of equity is that it would be unconscionable to permit the party making the assertion to retain the fruits of the bargain which he has thus secured, and therefore he must be held liable as for a species of constructive fraud, even though he may not have known that his statement was false. He is bound at his own peril to know the truth of the matter of which he speaks, and the inquiry is not whether he knew the representation to be false, but whether the other party believed it to be true and was misled by it in entering into the contract."

In this general connection see also Section 103, 104, 111 and 410 of the work just quoted from.

For the reasons above pointed out the decree of the court below is reversed and the cause remanded, with directions for the entry of a decree consistent with the foregoing opinion.

TERRELL, CHAPMAN, THOMAS and SEBRING, JJ., concur.

BUFORD, C. J., and ADAMS, J., dissent.

BUFORD, C. J., dissenting:

The record indicates that neither party to this suit was in need of a guardian or the protective wing of an angel. As I see the record it is as if one practical and experienced horse-trader just out traded another of equal knowledge and experience. Each party expected a profitable result. Both could not be gratified. Neither should welch.

I think the record amply sustains the decree of the chancellor and that the same should be affirmed.

ADAMS, J., concurs.