Oscar **HAUBEN**, Plaintiff-Appellant,

v.

W. Clayton **HARMON**, Robert K. **Harmon**, Jr. and Cypress Gardens Realty and Insurance, Inc., Defendants-Appellees.

No. 77–1769.

United States Court of Appeals, Fifth Circuit.

Nov. 2, 1979.

Rehearing Denied Dec. 12, 1979.

---

Thomas A. Clark, Emily W. Lawyer, C. Timothy Corcoran, III, Tampa, Fla., for plaintiff-appellant.

Roy C. Summerlin, Harry E. King, Winter Haven, Fla., for defendants-appellees.

Before GODBOLD, SIMPSON, and RONEY, Circuit Judges.

SIMPSON, Circuit Judge:

This diversity action was brought in the district court by appellant buyer, Oscar Hauben, against the sellers, W. Clayton Harmon and Robert K. Harmon, and the broker, Cypress Gardens Realty & Insurance, Inc., seeking rescission of a land sale contract on the grounds of fraud, misrepresentation and concealment. Title 28, U.S.C. Section 1332. The sellers counterclaimed seeking damages for breach of contract. The broker counterclaimed for its commission.

The trial court initially entered judgment for the sellers on their counterclaim in the amount of $83,400.00 and ordered that the broker's commission be paid from the judgment. The parties filed various post-trial motions. All were denied except the sellers' Rule 59(e) motion that the broker's commission be paid in addition to and not out of the $83,400.00 judgment in favor of sellers. F.R.Civ.P. 59(e). The court postponed hearing on this motion until a subsequent date. Later the parties entered into a settlement agreement in which the broker agreed to accept $10,000.00 in full payment of its claim for commission. After hearing argument of counsel on the seller's Rule 59(e) motion, the court approved the settlement of the broker's claim, dismissed the broker from further proceedings, and granted sellers' motion by increasing the gross judgment in favor of the sellers by $10,000.00, the amount of the agreed settlement of the broker's claim. The buyer appeals from the judgment contending (1) that the district court erred in holding the buyer was not entitled to rescind, and (2) that the district court lacked jurisdiction to hear the sellers' Rule 59(e) motion. We find these contentions without merit and affirm.

On May 18, 1973 the buyer entered into a land sale contract with the sellers to purchase 834 acres of land in Lake County, Florida, bounded on the south by the Withlacoochee River, for $717,240.00, a price of $860.00 per acre. The contract provided that the purchase price included all oil and mineral rights. The land is partially located within the Southwest Florida Water Management District (the District) and the Green Swamp Flood Detention Area and is consequently subject to condemnation by the State of Florida for the flood control project. The Green Swamp Flood Detention Area is part of a flood control project the purpose of which is the avoidance of flood conditions by impounding water for a period to allow rivers feeding out of the area time to complete local drainage. The central controversy in this appeal is whether the sellers' non-disclosure of the State's possible condemnation interest in the property gave the buyer the right to rescind the contract.

The sellers did not disclose that a substantial portion of the property lies within the Green Swamp Flood Detention Area. The district court held that this information was not material because the state had periodically and intermittently acquired land in the area for some 35 years, and it was pure speculation whether this or any other piece of property might ever be condemned. Although at trial the buyer argued that the sellers had misrepresented that the land was high and dry and suitable for residential development, the evidence did not establish that the land was not as represented.

About two weeks before entering into the sales agreement the sellers visited the District office on May 3, 1973 and discussed the District's intentions concerning the proper-

ty. This visit was followed by a telephone call from one of the sellers to the District. The sellers did not disclose any of the information received as a result of the visit or telephone call to either the buyer or the broker. However, the trial court found the failure to disclose this information was not a concealment of a material fact justifying rescission because the sellers did not receive any definite information as a result of the visit or the phone call.

Before executing the contract the buyer physically inspected the property on two occasions. Neither the sellers nor the broker attempted to forestall an independent inquiry into the character and circumstances surrounding the property. In fact, the broker encouraged the·buyer to do so by giving him the telephone number of the local zoning board and suggesting that he call it. The buyer is a capable and experienced businessman, unlikely to rely blindly on any of the sellers' representations.

In the late summer of 1973 a title search revealed an outstanding $\frac{1}{16}$th interest in the mineral rights not owned by the sellers. Because the sellers would not be able to convey all mineral rights, the buyer threatened to rescind. The sellers attempted to return his $20,000.00 deposit, but the buyer refused to accept it. On November 19, 1973, the buyer and the sellers executed an addenda to the May 3 contract which stated that the parties disputed whether the original contract required the sellers to deliver all the. mineral rights or only those mineral rights owned by the sellers. Under the addenda, the buyer agreed to forego his possible right to rescind in return for the sellers' agreement to institute a partition action to acquire the outstanding mineral rights. The partition action was commenced, and by August of 1974 the sellers reached an agreement with the owners of the outstanding mineral rights to purchase that interest. By the terms of the addenda the original contract otherwise remained "in full force and effect, unaltered and unmodified."

Between the execution of the original contract and execution of the addenda, the sellers had several communications with the District concerning the District's plans with regard to the property. In one letter the District indicated that it might need 70–75% of the property, that after obtaining appraisals it would be in a position to negotiate for the property, and that if negotiations failed it might institute condemnation proceedings. The district court found that the failure to disclose information learned from communications with the District after execution of the original contract but before execution of the addenda was not a non-disclosure justifying rescission of the contract because the sellers did not learn that the District definitely planned to condemn the property until two months after execution of the addenda. Until then, said the court, it was pure speculation whether the property would be condemned. A condemnation suit was filed by the District on June 24, 1974 and was voluntarily dismissed by the District in September of 1975.

Upon learning of the prospective condemnation the buyer sued for rescission of the contract. The sellers and the broker counterclaimed. The district court found that the buyer was not entitled to rescind. Judgment was entered in favor of the sellers and the broker on their respective counterclaims. It is from this judgment that the buyer appeals.

■■■ Generally, in order to establish a cause of action in fraud under Florida law, a plaintiff must establish that: (a) the defendant knowingly made a false statement concerning a material fact; (b) the defendant intended that the plaintiff rely on the statement; (c) the plaintiff relied upon the statement; and (d) the plaintiff was damaged as a result of that reliance. See, for example, *Ball v. Ball,* 160 Fla. 601, 609, 36 So.2d 172, 177 (1948); *Sutton v. Gulf Life Ins. Co.,* 138 Fla. 692, 693, 189 So. 828, 829 (1939); *Nixon v. Temple Terrace Estates, Inc.,* 97 Fla. 392, 397, 121 So. 475, 477 (1929); 14 *Fla.Jur.* Fraud and Deceit § 9. Under certain circumstances, an innocent misrepresentation of a material fact, relied on to another party's detriment, is grounds for rescission of a contract. *Robson Link &*

*Co. v. Leedy Wheeler & Co.,* 154 Fla. 596, 616, 18 So.2d 523, 533 (1944); *Langley v. Irons Land & Development Co.,* 94 Fla. 1010, 1017, 114 So. 769, 771 (1927). This exception to the requirement that knowledge and intent to defraud be proven appears to rest on two logical grounds. First, even an innocent maker of a false statement should not be allowed to profit at the expense of an innocent party. Second, a deceived party should not be bound to a contract simply because he cannot prove the representor knew the statements were false when made. *Robson Link & Co., supra,* 18 So.2d at 533.

■ The facts of the instant case differ from the typical fraud or misrepresentation cause of action because here there were no affirmative misrepresentations. Instead the buyer claims the sellers failed to disclose material facts concerning possible future condemnation. A non-disclosure of a material fact as well as an overt misrepresentation can constitute fraud justifying rescission of a contract. *E. g. Robson Link & Co., supra,* 18 So.2d at 532; *Hirschman v. Hodges, O'Hara & Russell Co.,* 59 Fla. 517, 527, 51 So. 550, 554 (1910); 14 *Fla.Jur.* Fraud and Deceit § 27. However the Supreme Court of Florida has stated that although nondisclosure of a material fact may be grounds for relief,

> where the facts lie equally open to the vendor and vendee with equal opportunity of examination, and the vendee undertakes to examine for himself, without relying upon the vendor's statement, it is no evidence of fraud that the vendor knew facts not known to the vendee and does not make them known to him.

*Stephens v. Orman,* 10 Fla. 9, 86–87 (1862); *see also Hirschman v. Hodges, O'Hara & Russell Co., supra,* 51 So. at 554; *Robson Link & Co., supra,* 18 So.2d at 531. The record in this case indicates that the buyer and sellers apparently had equivalent access to the information concerning the property,

that the buyer did not rely on the sellers' representations, and that the buyer did conduct an investigation of his own.

■ Additionally, an affirmative duty to disclose exists in Florida only if there is a fiduciary relationship between the parties or the facts are solely within the knowledge of the representor or some trick has been employed to prevent an independent investigation by the representee. *Ramel v. Chasebrook Construction Co., Inc.,* 135 So.2d 876, 882 (Fla.App.1962). Fraud is not presumed; the burden of proof lies on the party claiming to have been defrauded. *Barrett v. Quesnel,* 90 So.2d 706 (Fla.1956). With these basic principles of Florida law in mind, we proceed to the buyer's assignments of error.

■ The sellers did not disclose that a substantial portion of the property sold lies within the Green Swamp Flood Detention Area. While that name may sound foreboding, the evidence at trial did not show that the property within this area is flooded or otherwise unsuitable for residential, commercial or other normal uses. Property within the area is *possibly* subject to condemnation by the state. However, the Green Swamp Flood Detention Area covers more than fifty square miles. The state's condemnation activities in the area have been continuing off and on for more than three decades. It is thus a matter of speculation whether any one piece of property within this area may ever be condemned. A fact is material if but for the alleged non-disclosure or misrepresentation the complaining party would not have entered into the transaction. *E. g., Morris v. Ingraffia,* 154 Fla. 432, 437, 18 So.2d 1, 3 (1944); *Great American Insurance Co. v. Suarez,* 92 Fla. 24, 29–30, 109 So. 299, 301 (1926). Furthermore the issue of materiality of an alleged non-disclosure or misrepresentation appears to be a question of fact under Florida law.[1] Considering the tenu-

---

1. *Biscayne Blvd. Properties, Inc. v. Graham,* 65 So.2d 858, 859 (Fla.1953); 14 *Fla.Jur.* Fraud and Deceit § 88. *Biscayne Blvd. Properties, Inc.,* the only Florida case which approached this question, does not clearly state that materiality

is a question of fact, but it is cited by *Florida Jurisprudence* as supporting such a proposition. The Florida test for materiality in this type case is whether, but for the non-disclosure or misrepresentation, the complaining party

ous and speculative effect of part of the land sold being partially within the Green Swamp Flood Detention Area, we agree with the district court's determination that this information was not material under Florida law.

■ The buyer also claims that the information received by the sellers as a result of the May 3, 1973 meeting and the May 18, 1973 telephone conversation with the District was more specific information which *was* material and should have been disclosed. The district court found that the sellers received no definitive information as a result of the meeting and the telephone conversation and that therefore the information was not material. Under Florida law, mere statements of possibilities do not generally constitute false statements of material facts. *Sutton, supra,* 189 So. at 829; *Greenberg v. Berger,* 46 So.2d 609, 610; (Fla.1950), *Farnham v. Blount,* 152 Fla. 208, 218, 11 So.2d 785, 790 (1942), 14 *Fla.Jur.* Fraud and Deceit § 13. Similarly, a failure to disclose mere possibilities cannot be a failure to disclose material facts.

■ The buyer argues that even if the sellers had no definitive information prior to the execution of the original contract, they had such information, which should have been disclosed, prior to entering the November 18, 1973 addenda to the contract.[2] However the district court found that it was not until two months after execution of the addenda that the sellers learned the District actually planned to acquire the property through condemnation and that before that time the possibility of

condemnation was speculative. In view of this factual determination, the district court was amply justified in holding that this information was not material because of its speculative nature.

■ In his efforts to establish the non-disclosed information as material, the buyer cites several Florida opinions which hold that the pendency of condemnation proceedings at the time of execution of a contract constitutes a defect in title and is grounds for rescission of the contract. *Walton Land & Timber Co. v. Long,* 135 Fla. 843, 185 So. 839 (1939); *Westerlind v. Dehon,* 326 So.2d 24 (Fla.App.1976). As the district judge explained in his opinion, these cases do not apply to the facts of the instant case because in each of them the condemnation action was filed before the execution of the contract.

■ After finding that there had been no misrepresentation or non-disclosure of material facts, the district court correctly applied the doctrine of equitable conversion as taught by the case of *Arko Enterprises, Inc. v. Wood,* 185 So.2d 734 (Fla.App.1966). Under the doctrine of equitable conversion a purchaser of realty becomes seized of beneficial title to the property upon execution of the contract of sale. *Id.* at 736. The vendor carries the burden of loss before execution of the contract and the vendee carries the burden of loss after execution of the contract. *Arko* applied the doctrine of equitable conversion and held that condemnation of real property after execution of the contract and before conveyance of legal title was not a ground for rescission and

---

would not have entered into the transaction. *Morris v. Ingraffia, supra,* 18 So.2d at 3; *Great American Insurance Co. v. Suarez, supra,* 109 So. at 301. Considering the Florida test of materiality, it is evident that it is the function of the trier of fact to weigh the evidence and determine whether the party would have entered the transaction even if the information had been disclosed.

2. Appellant buyer summarily concludes, without supporting authority, that the addenda to the contract constituted a new contract which required full disclosure of all material fact concerning the original contract, even those facts having little, if anything, to do with the adden-

da transaction. Certainly a modification to an existing contract constitutes a new contract. 7 *Fla.Jur.* Contracts § 169. Although a contract may be modified, the general rule is that the original contract stays in force except as modified. 17 *Am.Jur.*2d Contracts § 459. No Florida case has addressed the issue of whether a party is required to disclose events occurring after execution of an original contract which have little if anything to do with subsequent modification to the contract. Since we have determined that the information sellers gained after execution of the original contract was not material, we need not decide this issue.

that the buyer was entitled to the condemnation award in place of the land. *Id.* at 740. Although events short of actual condemnation may, in the proper circumstances, be grounds for rescission, the instant record does not establish such events.

The buyer also asserts that the district court improperly considered the subsequent dismissal of the condemnation suit. This assertion is without merit. It is clear from the district court opinion that the district judge mentioned the dismissal in passing without considering it in his decision.

■ Finally, the buyer argues the district court lacked jurisdiction to grant the sellers' Rule 59(e) motion to assess the broker's commission against the buyer rather than requiring it to be paid from the judgment in favor of the sellers. Originally the district court entered judgment for the sellers for $83,400.00 and directed that the $50,040.00 broker's commission be paid from that amount. All parties thereafter filed various timely post-trial motions. All motions were denied except the sellers' Rule 59(e) motion. The district judge directed:

> However, with respect to the allegations in Paragraph 1 of the Harmon motion filed October 6, 1976, counsel will be heard at Tampa on a motion to alter or amend that portion of the Opinion and Judgment under Rule 59(e), providing such a motion is filed within 10 days of the notice of this Order by the Clerk, as I will be sitting again at Tampa from February 14, 1977, through March 4, 1977.

App. at 189.

On the court's direction, the sellers refiled the motion which was subsequently granted. The buyer argues the district court lacked jurisdiction to hear the motion because more than ten days had elapsed from the time of entry of the judgment until the sellers filed the motion for the second time. The Federal Rules of Civil Procedure require a motion to alter or amend a judgment to be served not later than ten days after entry of judgment. F.R.Civ.P. 59(e). The ten day limit cannot be enlarged by the court. F.R.Civ.P. 6(b). The district court did not offend these rules as the sellers

initially filed the motion within the ten day period. The district court merely delayed ruling on the timely motion until it could hear argument of counsel.

The judgment appealed from was correct. It is

AFFIRMED.

GODBOLD, Circuit Judge, dissenting:

I would reverse.

The majority read the district court opinion as holding: (1) Prior to execution of the original contract and execution of the "addenda," the possibility of condemnation of the land was so speculative and uncertain that failure by the sellers to disclose this possibility was not concealment of a material fact; (2) It was not until two months after execution of the addenda, when the sellers learned that the flood control district "definitely planned to condemn the property," that the possibility of condemnation was anything more than "pure speculation."

As the majority opinion notes, in Florida matter is material when, if the representee had been told of it, he would not have entered into the contract. *Morris v. Ingraffia*, 18 So.2d 1, 3 (Fla.1944).

In considering materiality, the majority opinion looks first at generalized information about the district and its history of condemnation, and second at particular information obtained by the sellers between May 3 and May 17. Each prong, they conclude, does not rise to the level of materiality. The original contract was signed May 18, 1973. The district court found:

> From the evidence presented, the Harmon brothers knew prior to executing the May 18, 1973, contract that a substantial portion of their property was within the Green Swamp Detention Area and subject to possible future condemnation.

Obviously a seller is not required to call the buyer's attention to the existence of a general governmental power of eminent domain. I agree with the majority that the location of land in a water district that has power to condemn did not alone move this case high enough up the scale to reach the

level of materiality, nor did the history of condemnation activities in the area over the past three decades. But somewhere up the scale the possibility of condemnation becomes sufficiently high that, if known to the seller, he must reveal it, because it is a fact that, in all good sense, would cause the putative buyer to decline to enter into the transaction. There is no magic in the fact that the unrevealed subject matter relates to the governmental power to condemn. No court would hesitate over a case where, for example, before a contract for the sale of land is signed today, the seller knows that suit papers to condemn the land have been prepared and signed and will be filed tomorrow. The ordinary buyer does not intend to buy a condemnation suit which brings with it frustrations, delays, expense, attorney fees, the risk of not receiving a fair award, and the possibility that plans for use or development must be changed because of alterations in size, contour or accessibility of the land.[1]

What moves this case up the scale and satisfies materiality is not the generalized kind of information that the district court and the majority describe but the activities of the sellers during May 1973, which demonstrate that they considered the possibility of condemnation highly material. The district court was inexplicably gentle, and this court inexplicably silent, about what occurred. The district court found that the

sellers, the Harmons, visited the office of the flood district on May 3. They did not go to talk about football or because they were interested in condemnation as an abstract subject of intellectual interest. They were not in pursuit of information about land in general, or overall condemnation policies, or of any other irrelevant information. They went to get information about the extent to which the particular land here involved was below the mean annual flood elevation and was therefore subject to condemnation by the district. Let us look at the record.

Clayton Harmon testified that before May 18 he had no knowledge that the land was subject to possible condemnation suit,[2] had no contact with the flood control district[3] and in fact had never heard of the district.[4] He testified that he "disclaim[ed] any knowledge [prior to May 18] about the District and about the fact that the District might be interested in acquiring this property." (A.43). He placed his first and only trip to the district office as occurring after the contract with plaintiff was signed (A.85). The nature of the conversation that occurred was "To see exactly where they planned on putting this flood control area." (A.87). The person with whom they [the Harmons] talked showed them a map that included some of the property involved in this litigation and showed them a curve on it (A.87).

1. Persons with inside information or expertise may buy in anticipation of profiting from condemnation, but there is no evidence that the plaintiff was such a buyer.

2. A.42:
Q. All right sir. At the time that you and your brother executed that contract, did you have any knowledge that the land was subject to a possible condemnation suit?
A. None whatsoever.
     *    *    *    *    *    *
A.84–85:
Q. Forgive me if it's repetitive, but on the date of May 18, 1973, when you entered into the contract with Mr. Hauben, you didn't have any notice that this property would possibly be condemned by SFWMD?
A. No.
Q. You didn't have any notice or knowledge that SFWMD might be in any way interested in the property?

A. No.
To the same effect, see A.90–91.

3. A.43:
Q. Had you had any contact with the Southwest Florida Water Management District on or prior to May 18th, 1973?
A. No, none to my knowledge.
     *    *    *    *    *    *
A.83:
Q. In other words, at no time before May 18, 1973, had you had any discussions with anybody connected with the SFWMD that this land might possibly be condemned?
A. No.

4. A.43:
Q. All right. Had you heard of that entity— we'll call it the District or SFWMD, if we might—on May 18th, 1973?
A. No.

Q. And showing you that curve on the map meant that they were contemplating condemning it?

A. Right.

A.87. Clayton Harmon asked why the land was being condemned, and the person with whom they talked explained (A.87–88).

Robert Harmon testified that, before May 18, he had no knowledge of possible condemnation,[5] knew nothing about possible flood control[6] and made no trip to the district office.[7] He testified that his only visit to the district office was after May 18 (A.93).

Plaintiff introduced the following memo from the files of the district:

May 7, 1973

MEMORANDUM

TO: ROBERT WATSON, DIRECTOR, REAL ESTATE DIVISION

THROUGH: DONALD R. FEASTER, ACTING EXECUTIVE DIRECTOR

FROM: JAMES A. MANN, ACTING DIRECTOR, WATER RESOURCES DIVISION

SUBJECT: THE HARMON BROTHERS/ GREEN SWAMP FDA

Robert and Clayton Harmon were in the office Thursday, May 3rd to discuss their acreage (see attached map) which is partially within the Green Swamp FDA. Would you kindly get-in-touch with them to discuss our land acquisition intentions for their property within the FDA. They wish to develop (residential) their property or sell to development interests.

They have asked for a determination of the mean annual flood on their holdings. Malcolm Johnson will be determining this and it will be forwarded by letter about two weeks hence.

JAM:1r

Attachment

Attached to the memo was a sketch map of the Harmons' property including that in question in this case.

In oral testimony, James A. Mann, the director of the district, explained that the mean annual flood elevation is the physical limit to the jurisdiction of the district's development authority. With his recollection refreshed by the May 7 memorandum, Mann testified (A.51):

Q. And does the memorandum refresh your memory as to the subject matter of the conversation that you and the Harmons had on that occasion?

A. Yes. The memorandum talks about property which they discussed with me at that time which was partially in the Green Swamp Flood Detention Area, part of the Four River Basins Florida Flood Control Project which the District is active in construction along with the Corps of Engineers.

And I'm requesting of Mr. Watson that he get in touch with the Harmon brothers to discuss our land acquisition intentions of their property, which I indicated was partially within the Flood Detention Area. And also I indicated that they wished to develop paren residential close-paren their properties to sell or to sell to development interests; and that they had asked my office and the men who had been working for me to make a determination of the mean annual flood elevation on their properties.

And I indicated that we would be forwarding that information on the

5. A.46:
Q. . . . At the time of the sale of this land to Mr. Hauben, you did not tell him about any possible condemnation of this property, did you?
A. I didn't know anything about it.

6. A.46–47:
Q. And did you tell him [plaintiff] anything about possible flood control?

A. No sir, I didn't know anything about it.

7. A.47:
Q. It's your testimony that you did not make this trip to Brooksville before this contract was signed on May 18, 1973?
A. No sir.
Q. That's your testimony?
A. Yes sir.

flood elevations to them within about two weeks' time.

\* \* \* \* \* \*

And later he testified further (A.53):

Q. And in discussing what was land acquisition intentions, was the possibility of the District acquiring the land discussed with the two Mr. Harmons?

A. Yes, I believe that there was in connection with our flood detention area land acquisition for water storage purposes.

A letter from Mann to Clayton Harmon dated May 22 sheds additional light on events that occurred before the signing of the contract. It said:

An analysis of the data of the U.S. Geological Survey Gaging Station on the Withlacoochee River near Eva shows that the mean annual flood state at State Road 33 is approximately 110 feet mean sea level. The mean annual flood occurs on the average of every 2.33 years. Records have been collected at this station since 1958. From this analysis it appears that about 90% of the property as outlined on the attached map would be under water during the mean annual flood. As indicated to you by phone, Mr. Robert Watson of the Southwest Florida Water Management District, Real Estate Division, will be in contact with you in the near future.

Telephone company records disclosed that there had been a long-distance call from the Harmons' office in Winter Haven, Florida, to the district's office in Brooksville, Florida, on May 17, one day before the contract was signed.[8] Mann testified that, in such a telephone call on May 17, Harmon would have understood that Watson would be in touch with him (Harmon) "to discuss the possibility of the District acquiring all or parts of the land holdings which he originally discussed with me in the office on May 3rd."

In view of the documentary evidence and the oral testimony I have described, the district court could hardly accept as credible the Harmons' testimony. And it did not. It rejected their testimony and found that they did visit the district office on May 3. But it found that what they learned then, and learned later before the addenda was signed, was not sufficiently "definitive" to cause the information to be material. This focus upon the uncertain nature of what the Harmons *learned* before May 18 ignores the probative force of what they *did* before May 18. It is obvious that they considered the risk of condemnation to be significant. The matter can be pointed up this way. Assume that on May 18 the Harmons had said to plaintiff: "This land is partially within a flood control district that has the power to condemn land up to the mean flood elevation. The location of the mean flood elevation and thus the scope of possible condemnation is of sufficient concern to us that since we began negotiating with you we have visited the district office to inquire about both the possibility of condemnation and the possible scope of condemnation and were in telephone contact yesterday to learn when the information will be forthcoming. We have been shown a map of our land describing the parts contemplated for condemnation. We should hear from the district in a few days with more precise description of it."[9] I think the buyer would have said: "If it's that important to the sellers, I think that I will wait and see what the district says." If there is any doubt of the *significance* of what the Harmons learned before May 18, it is dispelled by the fact that at trial they denied learning anything and denied the events that gave rise to knowledge on their part. Concealment of the possibility of condemnation, the pursuit of more firm information concerning that possibility, and the concealment of that pursuit, all illuminated by the incredible and non-credible efforts to

---

**8.** Robert Harmon denied making the call shown by the records and attempted to explain it on the basis there were "a lot of people" in his office who could have made it and other people that come in his office and make phone calls. (A.46).

**9.** Or, assume a third person had conveyed the same information to plaintiff.

conceal it at trial, add up to materiality before May 18.

Events after May 22 are further evidence of the significance of the possibility of the condemnation and of the Harmons' activities and of what they learned before May 18. On September 12, 1973, after the contract was signed and before the addenda was signed (November 18), a broker purporting to represent the Harmons called the district and protested that he was losing a deal to sell property of the Harmons (to persons other than plaintiff) because a representative of the district (Watson or another person) had told his clients that the district intended to acquire the property. He threatened to sue the district for loss of a $50,000 commission. The district checked and found that preliminary drawing had been completed showing that approximately 65% of the Harmons' land would be taken. The broker was informed of this and told that the acquisition depended upon legislative appropriations in the next year. The broker became angry and threatened to get an injunction against interference with his sale. The attorney for the Harmons called the district and was told that 70% to 75% of the Harmons' property would be needed, that the district would negotiate for purchase and failing that might file condemnation proceedings around March 1974. The district suggested that the Harmons might be willing to state a purchase price.

On October 5 the attorney for the Harmons wrote the district asking exactly what part of the Harmons' land the district was planning on acquiring, and when. None of these events were revealed to plaintiff, although obviously the facts had moved even further up the scale of materiality. On November 18 plaintiff signed the addenda. In December the district replied to the attorney's letter, sending legal descriptions and stating that it hoped to have the appraisals received and completed shortly. In January 1974 the district wrote the Harmons that it was approving the property for

condemnation. None of this was revealed to the plaintiff. Formal motion of condemnation was given to the Harmons in July 1974, and a few days later plaintiff notified the Harmons that he rescinded. For reasons not stated in the record the condemnation suit was dismissed in September 1974.

I find no Florida case on failure to reveal the known possibility of condemnation. In *Hermes v. Anton*, 300 So.2d 46 (3d D.C.A. Fla., 1976), the owner negotiated with plaintiffs to lease property to them, telling them that the state planned to condemn it in a year or a year and a half. Actually a condemnation suit already had been filed. Plaintiffs leased for a year at $400 per month, moved in and made repairs, and after two months had to move out when notified the property now belonged to the state. Plaintiffs sued for fraud in the inducement. The trial judge granted summary judgment for the owner on the ground plaintiffs had actual notice of the state's intent to condemn. The Court of Civil Appeals reversed because there was a genuine issue of material fact whether the owner, at the time the lease was signed, had notice of the date of taking. *Id.* at 47.[10] Thus, the critical issue was not whether suit had been instituted but whether the owner misrepresented a fact known to her that was material to the leasee's reasonable expectancy of enjoying the use and occupancy of the property. Here there was concealment of similar, though different, information material to the plaintiff's reasonable expectancy concerning this property.

In *Musgrave v. Lucas*, 238 P.2d 780 (Or. 1951), the seller of a sand and gravel operation on land next to a river received a warning from the War Department to discontinue removing sand and gravel because it might alter the course of the river. The seller sold without revealing the warning. The Oregon Supreme Court held the nondisclosure a sufficient basis for relief based upon fraud, saying:

10. On remand a jury awarded $20,000 punitive damages for fraud and the trial judge remitted down to $1,800. On appeal the court reinstat-ed the award. 346 So.2d 1205 (3d D.C.A. Fla., 1977).

Manifestly, the mere giving of such notice to defendants is, of itself, a highly important and material fact. Whether, in truth, the conduct of their business would actually change the channel of the river, or otherwise be in violation of law, is not the material consideration as respects the matter now under discussion. The pertinent thing is that defendants had been threatened with litigation of a serious nature, by a responsible official of the federal government. Obviously, in selling the business to plaintiffs, good faith demanded, and it was the positive duty of defendants to make, a full disclosure of these facts.

*Id.* at 785–86.

I would reverse the district court. The most critical point is that neither the district court nor this court has given effect to what the Harmons *did*, as circumstantial evidence of materiality. In the end, what they did speaks much louder than what other people said to them.