## EDWARD BALL v. RUTH LATHAM BALL

36 So. (2nd) 172          June Term, 1948
June 18, 1948          Division A
Rehearing denied July 29, 1948

*Harrell, McCauley & Perrine, John W. Harrell* and *Robert R. Milam,* for appellant.

*Crawford & May, J. T. G. Crawford* and *Philip S. May,* for appellee.

CHAPMAN, J.:

The record in this case discloses that Edward Ball and Ruth Latham were married in Washington, D. C., on June 17, 1933, and shortly thereafter established a home on the St. Johns River on the outskirts of the City of Jacksonville, where they lived together as husband and wife until the month of January, 1943. During the month of May, 1943, Mrs. Ball left the home and instituted a suit for divorce in the Circuit Court of Duval County, Florida, on the ground of mental cruelty and in her bill of complaint prayed for a divorce and other relief.

On December 6, 1943, the defendant and cross-plaintiff, Edward Ball, filed an answer to the bill of complaint and a counterclaim in which he prayed for affirmative relief. On May 30, 1944, the court below, on motion of counsel for Mrs. Ball, entered an order dismissing her bill of complaint with prejudice to her right to again maintain a suit for divorce upon the facts alleged in the bill of complaint. In the same order the defendant, Edward Ball, was permitted to prosecute his counterclaim seeking or praying for an annulment of the marriage contract and antenuptial contract of the parties en-

tered into shortly prior to their marriage. One phase of this litigation was considered by this Court in an interlocutory certiorari proceeding, but our ruling therein is not pertinent to the issues presented on this appeal. Ball v. Ball, 155 Fla. 768, 21 So. (2nd) 458.

On February 1, 1946, by leave of the Court, the cross-plaintiff filed an amended counterclaim and, in part, alleged that the cross-defendant and the cross-plaintiff in early 1933 became engaged to marry and frequently exchanged ideas as to the responsibilities and obligations of marriage and the rearing and education of children which might be born to them as a result of their contemplated marriage, and their views on this point were set out in Sections Twelve and Thirteen of their antenuptial agreement signed by them on June 15, 1933, and are viz:

"Twelfth: It is agreed by and between the parties hereto that in the event the parties hereto have any child or children, that when one of the parties hereto shall have reprimanded, admonished or punished such child or children that even though the other party hereto may not have felt that such reprimand, admonishment or punishment was justified, no objection shall be raised to such reprimand, admonishment or punishment in the presence of the child or children, as the parties hereto realize that discipline is necessary and must be mutually enforced for the welfare and successful training and raising of a child or children.

"Thirteenth: It is mutually agreed by and between the parties hereto that in the event the parties hereto have a child or children, that such child or children shall have the benefit of a public school education up to and including the high school and that thereafter the parties hereto shall mutually decide whether it is desirable for such a child or children to have any additional educational facilities."

No child was born to the marriage.

The amended counterclaim alleges that the antenuptial contract and the marriage between the parties are invalid and should be anulled because of fraud practiced on the cross-plaintiff by the cross-defendant. Some weeks prior to June 19, 1928, the cross-defendant consulted Dr. George B. Nor-

berg, of Kansas City, Missouri, and was advised to undergo a surgical operation, which was performed at the Trinity Lutheran Hospital on June 19, 1928, by Dr. Norberg. The cross-defendant's right ovary and the right Fallopian tube were removed. The left ovary was not removed but cysts found thereon were punctured. The left Fallopian tube was either removed or some effort or steps taken by the surgeon to make the same patent. The cross-defendant was sterile on June 17, 1933, and for sometime prior thereto, and cross-defendant knew it or had good reason to believe that she was sterile.

The amended counterclaim further alleged that it was the duty of the cross-defendant, before the marriage ceremony was performed, to make known to the cross-plaintiff the fact that in the year 1928 she had a surgical operation involving her genital organs. It was her lawful duty to give to the cross-plaintiff all the information in connection with such matters, things and conditions as were known to her and also all of the knowledge and information that she could have obtained by the exercise of ordinary diligence. The defendant failed and neglected to give the plaintiff any information whatever regarding the surgical operation and the cross-plaintiff did not know that the cross-defendant had ever had an operation involving her genital organs or that her genital organs had been diseased. He did not know prior to marriage or prior to the filing of her suit on the 24th of May, 1943, of the diseased condition of her genital organs and he learned for the first time of the surgical operation and the diseased genital organs after she had instituted suit against him for divorce.

The amended counterclaim also alleges that the cross-plaintiff performed his full duties as the husband of the cross-defendant, administered to her needs and wants in sickness and in health and transferred to her stocks and bonds and caused the title to described interests in real estate to be placed in her name. A bank account in the joint names of the parties was opened and the husband deposited therein income and earnings as provided for by the terms and provisions of their antenuptial contract and that the cross-defendant now

holds this property, because of her fraud and deception, in trust for the cross-plaintiff as his trustee.

The counterclaim prays for a decree declaring the antenuptial contract and the marriage contract void ab initio and that all property transferred by the cross-plaintiff to the cross-defendant in contemplation of marriage be transferred or conveyed to him.

The cross-defendant, Ruth Latham Ball, in answering the amended counterclaim, admitted her marriage to Edward Ball; that she had been previously married at the age of 24 and lived with her former husband about seven years and she had no children; she married the cross-plaintiff in good faith at the age of 33 and he was 45, and prior to the marriage ceremony she signed the antenuptial agreement referred to; and she lived with the cross-plaintiff as his wife for approximately ten years, and no children were born to the marriage.

The cross-defendant in her answer admitted that prior to June 19, 1928, she consulted Dr. Norberg, a surgeon at Kansas City, Missouri, and, after an examination, he learned that she had a cystic ovary and a diseased appendix and advised her to undergo a surgical operation. For a short period of time prior to the operation until several hours afterward she was unconscious from the affect of an anaesthetic and of her own knowledge does not know and has never known whether her right ovary was cystic and greatly enlarged or whether her right Fallopian tube adhered around the cyst and stretched from its normal length of 2½ or 3 inches to about 8 inches, or whether her left ovary was cystic and degenerated or whether her left Fallopian tube was diseased and the fimbricated end closed as alleged; she was advised by Dr. Norberg, shortly after the operation, that he had removed her appendix and one ovary. She had no further knowledge or information about the operation than as conveyed to her supra by Dr. Norberg, except the information appearing in a pleading to the contrary filed December 6, 1943.

Since the filing of the original counterclaim on December 6, 1943, by investigation and inquiry, she learned and believes that in said operation her appendix, right ovary and right Fallopian tube were removed and her left ovary was treated

but not removed, and also that her left Fallopian tube was treated but not removed. She denied that on June 17, 1933, at the time of her marriage to the cross-plaintiff she was sterile. She denied that on said date, or any time prior thereto, she knew or had good reason to believe that she was sterile, but, on the contrary, she alleged that she was not sterile.

Answering further she admitted the operation was performed by Dr. Norberg at the Trinity Lutheran Hospital and a record of the operation was kept by the hospital, but she failed or omitted to inspect the hospital record as kept on her operation. She inquired of Dr. Norberg, after the operation and prior to her discharge on July 3, 1928, whether she could have a child and that he told her he saw no reason why she could not have a child and that he thought the best thing she could do would be to go home and have a baby. She alleged that all that was known to her of said operation at the time of the marriage was the removal of her appendix and one ovary.

The answer of the cross-defendant admits that she did not inform cross-plaintiff that one of her ovaries had been removed in the surgical operation but prior to marriage she did inform him that she had previously had a major operation and after marriage he knew or should have known that a major operation involved her genital organs. That the cross-plaintiff did not know that she was sterile because in fact she was not and is not sterile. After informing the cross-plaintiff of the major operation prior to marriage, his lack of information as to the diseased condition of the genital organs was due solely to his failure to make inquiry after being advised and informed of the major operation by the cross-defendant.

Cross defendant further reply to said amended counterclaim says "that notwithstanding the averments thereof, which the cross-defendant has hereinbefore and here again denies, said marriage is nevertheless valid by virtue of its ratification by the cross-plaintiff in this: That in the early years of their married life together she repeatedly discussed with the cross-plaintiff her failure to become pregnant and manifested to him her distress that she had not done so; that the cross-plaintiff never at any such discussion, or at any

other time, voiced or otherwise disclosed any concern or interest in, or questioned her concerning, her failure to become pregnant; that he never at any time complained to her or expressed any disappointment concerning her failure to become pregnant; that in the early part of the year 1938, of her own violition, she consulted a competent physician as to why she had not become pregnant; that said physician, after a physical examination and an investigation from which he learned that in said surgical operation her right ovary and right Fallopian tube had been removed, and that her left ovary had been treated by puncturing cysts contained therein, and that her left Fallopian tube had been treated by cutting off the thickened sacculated end and bringing the mucosa and serosa together, advised her that a slight operation would probably fix her so she could have children; that she promptly told the cross-plaintiff what the physician had said; that the cross-plaintiff then advised her to wait and never thereafter referred to said conversation or the subject thereof; that notwithstanding said next hereinabove alleged facts and circumstances the cross-plaintiff continued to live and cohabit sexually with her as his wife until on or about January 1, 1943, and thereby the cross-plaintiff ratified said marriage."

The Chancellor appointed Herbert Lamson as Special Master, with instructions to take the testimony of the parties and report the same, with his findings of law and fact. Many hearings were had before the Special Master and several hundred pages of testimony taken. The Special Master reported to the Chancellor that the equities of the cause were with the cross-plaintiff and a decree granting the relief prayed for should be entered. Exceptions were made to the report of the Special Master and, after argument before the Chancellor, exceptions were sustained and the cross-plaintiff's amended counterclaim by an appropriate order was dismissed, and he appealed.

Counsel for appellant pose here for adjudication several questions: (1) Was Ruth Latham Ball sterile on June 17, 1933, the date of the marriage? (2) Did Ruth Latham Ball, on June 17, 1933, know or have good reason to believe that she was sterile? (3) Was it the duty of Ruth Latham Ball to

608

inform the appellant as to the diseased condition of her genital organs, in view of her major operation on June 19, 1928, and additional information obtainable by the exercise of ordinary diligence, prior to the signing of the antenuptial contract and marriage with the appellant? (4) Did appellant first learn of the major operation after suit for divorce was filed on May 24, 1943? (5) After proving Ruth Latham Ball sterile prior to marriage and her fraudulent misrepresentation of these facts at the time of marriage, does the law require him to prove that he desired children, and none were born, and he was damaged by the fraud? (6) Did the appellant ratify the antenuptial contract and marriage by continuing to live with the appellee? (7) Was the appellant guilty of laches by continuing to live with the appellee? (8) If the appellee had a Rubin's test in January, 1944, and the test disclosed that she was sterile, and she knowingly concealed the fact, would not the appellant be entitled to relief in equity because of the doctrine of unclean hands? Other questions are raised by the appellant, but the foregoing strike at the tap root of this controversy.

The main questions propounded by appellee's counsel are viz: (1) Is a wife's non-disclosure of a known physical condition of sterility a fraud sufficient to vitiate a consummated marriage between a grass widow 32 years old to a bachelor 45 years old, independent of any other cause, at the suit of the husband instituted ten and a half years after marriage? (2) Is the evidence clear and convincing that the appellee was sterile at the time of marriage? (3) Is there support in the evidence for the Chancellor's conclusion that the appellant failed to establish remedial damages? (4) Is there support in the evidence for the Chancellor's conclusion that the appellee had no knowledge that she was sterile? (5) Is there support in the evidence for the Chancellor's conclusion that the appellant confirmed or ratified his marriage? (6) Is there support in the evidence for the Chancellor's conclusion that the appellant was guilty of laches?

The case of Jones v. Jones, 119 Fla. 824, 161 So. 836, involved the annulment of a voidable marriage on the ground of fraud. Augusta Jones married W. F. Jones when she had a

living husband and by fraud and deception induced W. F. Jones to marry her. W.. F. Jones at the time was without knowledge that Augusta Jones had a living husband. The parties lived together for some time when a child was born and shortly thereafter the husband Jones learned of his wife's living husband and brought suit for an annulment of the marriage, which was granted. We held to constitue fraud the wife must have known that her former husband was living and not divorced at the time of her second marriage, or must have been in possession of knowledge or facts sufficient to have put a person of ordinary and reasonable prudence upon notice of such facts and with such knowledge she must have, by word or act, represented that she was competent to contract marriage and the plaintiff must have married her in reliance upon such representations and without knowledge or reasonable means of knowledge to the contrary. See LeBlanc v. Yawn, 99 Fla. 328, 331, 126 So. 789; McClish v. Rankin, 153 Fla. 214, 14 So. (2nd) 714.

We have on many occasions ruled that to constitute fraud a misrepresentation must be of a specific material fact that is untrue and known to be so and stated for the purpose of inducing another to act, upon which statement the other relies in acting to his injury. Sutton v. Gulf Life Ins. Co.,. 138 Fla. 692, 189 So. 828; Mortgage Holding Corp. v. Summy, 97 Fla. 403, 121 So. 473; Allen v. United Zinc Co., 64 Fla. 171, 60 So. 182. There is involved in the matter of false representation as a basis for the rescission of contract the element of resulting injury to the person seeking relief which is not supplied by the bare allegation of such injury. There must appear such facts as show a connection between the representation as made and the value as affected by it. This material element of the alleged fraud must not be left to conjecture and averment. Stokes v. Victory Land Co., 99 Fla. 795, 128 So. 408.

On the question of the *ratification* of fraud by a litigant, Pomeroy's Equity Jurisdiction, Vol. (5th Ed.) says, if the plaintiff is a party to the fraud to such an extent that he is in pari delicto with the defendant, he cannot obtain relief as equity generally does not relieve a person from the conse-

quences of his own fraud. . . . If he is not in pari delicto, and is comparatively the more innocent of the two, he may obtain relief by doing full equity to those parties, if any, who have sustained an injury by his partial wrong. (Par. 916, pp. 595-96).

"RATIFICATION.—While the party entitled to relief may either avoid the transaction or confirm it, he cannot do both; if he adopts a part, he adopts all; he must reject it entirely if he desires to obtain relief. Any material act done by him, with knowledge of the facts constituting the fraud, or under such circumstances that knowledge must be imputed, which assumes that the transaction is valid, will be a ratification. (As said by the American Law Institute, 'The power of avoidance for fraud or misrepresentation is lost if the injured party after acquiring knowledge of the fraud or misrepresentation manifests to the other party to the transaction an intention to affirm it, or exercises dominion over things restoration of which is a condition of his power of avoidance. . . .'

"('The victim of the fraud cannot both affirm and disaffirm. He cannot claim under and against the fraudulent transaction').

"917. — PROMPTNESS — DELAY THROUGH IGNORANCE OF THE FRAUD—The most important practical consequence of the two principles above mentioned is the requisite of promptness. The injured party must assert his remedial rights with diligence and without delay, upon becoming aware of the fraud. After he has obtained knowledge of the fraud, or has been informed of facts and circumstances from which such knowledge would be imputed to him, a delay in instituting judicial proceedings for relief, although for a less period than that prescribed by the statute of limitations, may be, and generally will be, regarded as an acquiescence, and this may be, and generally will be, a bar to any equitable remedy.

"To this rule there is one limitation: it applies only when the fraud is known or ought to have been known. No lapse of time, no delay in bringing a suit, however long, will defeat the remedy, provided the injured party was, during all this

interval, ignorant of the fraud. The duty to commence proceedings can arise only upon his discovery of the fraud; and the possible effect of his laches will begin to operate only from that time."

On the single point that Mrs. R. S. Price, now Mrs. Ruth Latham Ball, was operated on at the Trinity Lutheran Hospital in Kansas City, Missouri, on June 19, 1928, by Dr. George B. Norberg, assisted by Doctors Stephens and Mumford, and that she remained in the hospital as a patient and was treated by Dr. Norberg until discharged by the hospital on July 3, 1928, is not seriously disputed. The affect of the surgical operation on the sterility of the cross-defendant-appellee is the storm center of this controversy. It is the cross-plaintiff-appellant's contention that the evidence adduced clearly established that the surgical operation rendered the appellee sterile and she knew it at the time of the marriage and the signing of the antenuptial agreement but fraudulently concealed this information from the appellant and to his injury. The appellee likewise contends that the evidence adduced by the appellant is legally insufficient to establish her sterility at the time of the marriage and the signing of the antenuptial contract because at the time she was sterile and the evidence is insufficient to establish fraudulent misrepresentation as asserted by the appellant.

The records adduced into evidence as kept by the Trinity Lutheran Hospital covering the period when the appellee was a patient (from June 18, 1928 until the following July 3rd, date of her discharge), coupled with the testimony of Dr. Mumford, when considered alone, are strong proof of the appellee's sterility. The appellee answers this testimony by stating that Dr. Mumford's testimony stands discredited on the record because of contradictory statements in letters by him sent to counsel for appellee prior to the time that he was called as a witness for the appellant and the explanations as by him given for the contradictions were not convincing. It is pointed out that the explanations should be considered in light of a per diem of $50.00, costs of transportation, and traveling expenses for the witness and his wife from California to Kansas City and return. The appellee testified that

she was too sick when in the hospital to keep up with the records there made and had never seen or read them.

On this pivotal point the testimony of Dr. Norberg should be considered in connection with the hospital records and Dr. Mumford's testimony. Dr. Stephens is shown to be dead. Dr. Norberg testified that in his career as a surgeon he had operated on several thousand patients and it was difficult for him to remember the details of the operation. He remembered the assistance given by Dr. Stephens but was unable to recall Dr. Mumford. From his personal record kept of operations, on July 12, 1935, he wrote Dr. Casler, of Baltimore, Maryland, who had the appellee as a patient, viz:

"Dr. DeWitt Bellinger Casler,
 13 Chase Street, West
 Baltimore, Maryland.

"Dear Doctor:

"Replying to your letter regarding Mrs. Ball, who was Mrs. Price in June 1928 when I had her for a patient.

"Our records show that she had a large ovarian cyst (right) with a long fallopian tube that was adhered around the cyst and stretched to the length of eight inches; the cyst and fallopian tube were both removed.

"On her left side she had a much degenerated cystic ovary and there was some question as to whether it should be removed or not; it was left in however after puncturing the cysts contained therein. The fimbriated end of the left fallopian tube was entirely closed; an effort to make this patent was done by cutting off the thickened sacculated end and bringing the mucosa and serosa together; an appendectomy was also done for the reason that the appendix showed considerable pathology.

"I trust this may be of some service to you and that your patient may realize her desire although it has been my experience that it is difficult to re-establish normal function in a diseased fallopian tube.

"Yours very truly,

(Signed) Geo. B. Norberg
Geo. B. Norberg, M. D."

As the writer studies the record, the above testimony was taken by depositation and the Special Master simply studied the record and reached conclusions. The record of the hospital showed that one ovary and both tubes were removed but according to appellant's theory, Dr. Norberg, who performed the operation, expressed the view that the left ovary and the left tube were not removed. Thus was presented a dispute and conflict in the testimony and was settled by the order of the chancellor below.

Several eminent gynecologists were called by the appellant and, after a study of Dr. Norberg's letter to Dr. Casler, supra, were asked to give or state an opinion as to the sterility of the appellee based on the facts and information in the latter. The majority view was to the effect that the appellee was sterile as a result of the major operation performed by Dr. Norberg. Dr. Casler, an outstanding gynecologist of Baltimore, had the appellee as a patient during May, 1934, July, 1935, and March, 1938. She had requested of the Doctor his opinion on why she was not pregnant, and, after a careful and thorough physical examination, was unable to assign a medical reason for her failure to become pregnant. On one of the visits he suggested a Rubin's test—the approved and recognized medical method of determining the physical capacity of a woman to bear children, or whether she possessed or did not possess the genital organs necessary for conception and bearing children. These physicians testified as to their custom of advising women after operations about their capacity to bear children and approved the practice of telling them the truth—whether for or against the patient. The testimony contradicts the appellee on the point to the effect that Dr. Norberg told her on leaving the hospital on July 3, 1928, "I see no reason why you cannot (have a baby), and I think the best thing you could possibly do would be to go home and have a baby." Dr. Norberg, when on the stand, stated that he did not remember making said statement.

The burden of establishing fraud by law rested on the cross-plaintiff as alleged in his amended counter claim. LeBlanc v. Yawn, supra. A presumption exists in the appellate court that an order made by the lower court and assigned as

error is correct and the burden of showing reversible error rests upon the party asserting it. Markett v. Hilpert, 140 Fla. 842. 192 So. 392. Where the findings of the Chancellor are supported by the evidence, or where the evidence is conflicting and there is substantial evidence to support the Chancellor's findings, such findings will not be set aside unless the appellant makes it clearly to appear that substantial error was committed by the Chancellor in his conclusion, or that the evidence clearly shows them to be erroneous. Central Hanover Bank & Trust Co. v. Smith, 134 Fla. 845, 184 So. 513.

A pertinent question presented on this record is, did the appellee know or have good reason to believe that she was sterile on June 17, 1933? It is not disputed that the appellee advised the appellant that she had, during June, 1928, submitted to a major operation. The parties apparently were content to let the matter rest, as they married and lived together for a period of approximately ten years. The appellant had the opportunity prior to marriage to explore the extent of the major operation by ascertaining whether or not the operation involved her genital organs, the hospital where the operation was performed, the names of the attending nurses, and the name and address of the operating surgeon, and the information was then available as was shown to have been some ten or twelve years later. It is suggested that the law made it the duty of the appellee to voluntarily disclose to her intended husband the several details of the major operation and if it involved her reproduction organs, which operation it is contended rendered the appellee sterile. Her answer in effect was that she told him of the major operation but did not express a view or make a statement about her possible sterility.

Our study of the evidence leads to the conclusion that the appellee at the time of the marriage did not know nor did she have good reason to believe that she was sterile. The appellant simply failed, which is clearly established when considering all the evidence, to carry the burden of proof as required by law by proving as alleged that the appellee was sterile or had good reasons to believe that she was sterile. We do not overlook the hospital records, the explanation

thereof by the appellee, Dr. Mumford's testimony, the opinions of expert witnesses, and many disputes and conflicts in the testimony. It is the writer's view that knowledge and information of her sterility became positively known to her, if at all, for the first time in January 1944, as a result of the Rubin's test as given by Dr. Te Linde.

The comments of the Chancellor below on this point are significant and are viz:

" . . . Mrs Ball's action in having the (Rubin's) test performed is of great significance to the issues in this case, in a way overlooked by counsel, that is, her motive. Regardless of the result of the test, she could have had but one thing in mind when she had it performed: To prove that she possessed the organs necessary to conception. Here is a woman charged with knowledge of her absolute sterility for more than fifteen years and fraudulent concealment thereof for more than ten years. What did she do when that charge was made in defendant's counterclaim? Her lawyer leaves to examine a hospital record on which the charge is based and she sets out on her own to seek irrefutable evidence that the charge is untrue. To me, it is unimportant that the result of the test disappointed her. What is important is that in January, 1944, she still did not know that she was physically incapable of bearing children. Certainly then, she had no such knowledge in June, 1933. An obvious objection can be made: She very guilefully stated that she had had the test made in order to induce the conclusion here reached. The answer to that proposition lies in (1) her obvious reluctance to testify that the test was made and (2) the fact that neither she nor her counsel up to this time have sought to give her action the significance here attributed to it."

The husband by his amended counterclaim filed in the Court below sought a decree holding void ab initio for fraudulent misrepresentations by the wife an alleged voidable marriage and antenuptial agreement of the parties. The issues were clearly defined by the answer of the wife, and after the taking of testimony by a Special Master, the Chancellor on final hearing allowed the wife counsel fees. It is contended here that the allowance was clearly erroneous

and not authorized by Section 65.07, F.S.A.; neither is there a contract between the parties to sustain this allowance. The answer to the contention is our ruling in Prine v. Prine, 36 Fla. 676, 18 So. 781, 34 L.R.A. 87, which ruling was by us reaffirmed in Courtney v. Courtney, 108 Fla. 276, 146 So. 229.

In the Prine case supra the husband sought to annul a marriage entered into during a period of intoxication from the excessive use of intoxicants and for that reason did not know or comprehend what he was doing; he was deprived of his power to reason; and for all intents and purposes was non compos mentis. We held under the facts therein that a court of chancery, independently of statute as an incident to chancery jurisdiction, could make and enter an appropriate order allowing the wife counsel fees. We fail to find merit in this assignment.

Affirmed.

THOMAS, C. J., TERRELL and SEBRING, JJ., concur.

June Term, 1948  
Division A