Gregory **CROSSMAN,** Plaintiff-Appellee,

v.

**TRANS WORLD AIRLINES,** Defendant-Appellant.

No. 84–1305.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 16, 1984.

Decided Nov. 27, 1985.

Rehearing Denied Jan. 8, 1986.

Franklin A. Nachman, Conklin & Adler, Ltd., Chicago, Ill., for defendant-appellant.

William J. Harte, Chicago, Ill., for plaintiff-appellee.

Before BAUER and CUDAHY, Circuit Judges, and DOYLE, Senior District Judge.*

BAUER, Circuit Judge.

Plaintiff prevailed in this diversity action against defendant on a claim of fraud and was awarded $75,000 in damages by a jury. The trial judge denied defendant's motions for directed verdict and judgment n.o.v., and defendant now appeals those rulings. We reverse.

I.

■ This case arose out of plaintiff's employment and subsequent arrest in Saudi Arabia. Because we review the trial court's denial of defendant's motions for a directed verdict and for judgment n.o.v., we view the evidence in the light most favorable to the plaintiff. *Moran v. Raymond Corp.*, 484 F.2d 1008, 1014 (7th Cir.1973) (applying Illinois law).

Since the 1950's, defendant Trans World Airlines (TWA) has performed a variety of contractual services for Saudi Arabian Airlines (Saudia), including recruiting and

* The Honorable James E. Doyle, Senior District Judge of the Western District of Wisconsin, is sitting by designation.

training employees. In 1976 TWA undertook recruiting Americans to work for Saudia. TWA placed an advertisement in a Miami newspaper announcing job openings in Saudi Arabia with Saudia, which is owned by the government of Saudi Arabia. Plaintiff Gregory Crossman responded to the advertisement in April 1976. As instructed by the advertisement, Crossman appeared at a designated location to apply for a position as an avionics technician and was interviewed separately by two TWA employees, Crowder and Metros. During these brief interviews potential problems an employee might have with the Saudi Arabian criminal justice system were not discussed.

After his interviews, Crossman was tentatively selected for employment. He then attended an orientation session for potential employees. Another TWA recruiter, John Massie, led the session. Massie described living conditions in Saudi Arabia and financial arrangements, and fielded questions from the applicants. He explained that initially they would be TWA employees and receive TWA salary and benefits, but that shortly thereafter they would become contract employees of Saudia. Although the details of the future Saudia contract were not yet known, the contract was expected to be more lucrative than the TWA employment contract. No one asked Massie about the possibility of a TWA employee or Saudia contractor being arrested in Saudi Arabia, but applicants other than Crossman asked about possible troubles communicating and dealing with the Saudi Arabian government, particularly after they became employees of Saudia. Massie stated that "TWA would always be there should [the employees] ever need any assistance, that TWA would not abandon their American partners or people."

Following the orientation session, Crossman signed an agreement accepting employment with TWA as a senior avionics mechanic. The agreement indicated that Crossman would become a Saudia employee at some future time. Crossman later received a packet of materials that included a "foreign laws agreement." The agreement, which Crossman read and signed, stated:

In consideration of employment, the Company requires employees to familiarize themselves with all governmental and company rules and regulations pertaining to their duties, and to faithfully abide by them.

The Company will not tolerate being subjected to annoyance, embarrassment or expense on account of conduct of an employee while on duty or off duty.

Employees who violate either Company or country laws and regulations with respect to currency controls and customs are subject to immediate dismissal, and further, the Company will take no responsibility with respect to payment of fines or penalties which may be imposed upon individuals found guilty of violating such customs regulations or currency restrictions. It will be entirely the individual's responsibility to supply funds for fines or penalties and to provide his own legal counsel, if any is required.

Crossman arrived in Saudi Arabia in June 1976. While he was a TWA employee, TWA assisted him with "daily problems." TWA also obtained a visa for Crossman and supplied him with airplane tickets when he had to make an emergency trip to the United States. In October 1976 the anticipated employment change occurred and Crossman signed a contract making him an employee of Saudia.

Sometime in September 1977, Crossman's supervisor at Saudia, Gabriel Chiroux, went to Crossman's house to look for a missing volt meter belonging to Saudia. Chiroux spotted the device in Crossman's house and questioned him about it. Crossman stated that he had borrowed it from the shop at work to use in fixing his automobile. Although Crossman did not have a certificate of title to the automobile, he stated that he had purchased the automobile from another American worker who was preparing to leave Saudi Arabia. On September 4th, Chiroux returned to Crossman's house with five or six other Saudia

employees, some of whom searched Crossman's belongings and confiscated some of his tools and other work-related objects.

On September 5, 1977 Crossman anticipated that he might be arrested. Believing that TWA offices were closed for the Labor Day holiday, Crossman called his ex-wife and then went to the American Embassy seeking assistance. The embassy was closed and Crossman was able to speak only to a Marine guard, who said he would pass along the information Crossman gave him about his situation. Later, Crossman went to his workplace, where he encountered a Saudia security employee. He was questioned by Saudia personnel and then taken to the police station and arrested. An hour later he was taken to the Royal Saudi Air Force jail, where he remained for six months. Crossman was then transferred to Jeddah prison, where he spent the final five months of his incarceration.

While Crossman was in jail, three Americans were arrested and jailed for distilling alcohol. Two of the three were TWA employees and the third, like Crossman, was a Saudia contract employee. The four Americans were jailed together, either in the same cell or in close proximity to one another. Various TWA employees came to visit the other American prisoners, and Crossman tried to deliver messages to TWA through two of them, Gardner and Smith. Crossman twice asked Smith if TWA was following his case and whether he knew the status of his case. The first time Smith ignored Crossman and did not respond to his query. At a later date, Smith relayed a message to Crossman from an embassy official about the status of his case. Crossman also sent notes to TWA through two of his friends.

When TWA employees in Saudi Arabia were arrested it was the practice of the TWA personnel office to monitor the flow of legal documents from one office to another in the Saudi Arabian criminal justice system. Saudi Arabian law does not provide a right to pre-trial bail or of habeas corpus. Thus, TWA's policy simply sought to prevent undue delay in the disposition of a case because of slow processing of the paperwork. TWA did not follow Crossman's case to the extent it monitored the cases of the other jailed Americans. United States embassy personnel, however, visited Crossman regularly and reported on the progress of his case.

During his confinement, Crossman appeared in court twice. An interpreter relayed questions to Crossman, who never admitted guilt as to any of the charges. After eleven months, Crossman was released from prison without having been adjudicated guilty. The court document ordering his release stated that although he was "chargeable" with the offenses of stealing the car and various work-related items, he had already served sufficient time for those offenses and should not be detained any longer. The three Americans jailed for distilling alcohol had admitted their guilt and had been released after five months of incarceration.

After his return to the United States, Crossman filed a five count complaint against TWA in the United States District Court for the Northern District of Illinois under diversity jurisdiction. The complaint alleged breach of contract, fraud, and intentional infliction of emotional distress. The District Court dismissed one count for breach of contract and the count for intentional infliction of emotional distress before trial. The case was then tried before a jury on one count of breach of contract and two counts of fraudulent misrepresentation.

At the close of Crossman's case, the trial judge directed a verdict in favor of TWA on the breach of contract count. The court submitted both fraud counts to the jury. Count III alleged that TWA fraudulently induced Crossman to sign his employment contract with Saudia. Count IV alleged that TWA fraudulently induced Crossman to sign the agreement with TWA to work in Saudi Arabia by falsely promising that TWA would represent Crossman in his dealings with the Saudi Arabian government, both while he was employed by TWA and after he became a Saudia employee.

The jury found in favor of TWA on Count III and in favor of Crossman on Count IV, awarding Crossman $75,000 in damages. TWA moved for judgment n.o.v. as to Count IV and appeals the district court's denial of that motion. Crossman does not appeal any of the district court's rulings.

## II.

Although this case was tried in Illinois, the trial judge applied Florida law to Crossman's claims of fraudulent misrepresentation. Because the contract between Crossman and TWA was executed in Florida, neither party disputes that Florida law was applicable to Crossman's substantive claims under Illinois conflict of laws principles. Neither party, however, is clear as to which state's laws provide our standard of review on this appeal. It is clear that in diversity cases this court applies state law in reviewing a trial court's denial of a motion for judgment n.o.v. *Dickerson v. Amax Inc.*, 739 F.2d 270, 272 (7th Cir. 1984). Under Illinois conflict of laws principles, the procedural law of the forum state is the proper law to apply. *People v. Saiken*, 49 Ill.2d 504, 275 N.E.2d 381, 385 (1971), *cert. denied*, 405 U.S. 1066, 92 S.Ct. 1499, 31 L.Ed.2d 796 (1972). In *Ogdon v. Gianakos*, 415 Ill. 591, 114 N.E.2d 686 (1953), the Illinois Supreme Court stated that "procedural law" includes "the foundation for [appellate] review." 114 N.E.2d at 689. We will therefore apply Illinois' standard of review in this case.

Under Illinois law, a judgment n.o.v. may only be entered "in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors [the] movant that no contrary verdict based on the evidence could ever stand." *Szarat v. City of Chicago*, 117 Ill.App.3d 809, 73 Ill.Dec. 324, 454 N.E.2d 68, 71 (1983). "[I]f no evidence or a mere scintilla of evidence is presented tending to prove the plaintiff's allegations, the court should direct a verdict" or enter judgment n.o.v. for the defendant. *Cokinis v. Maywood-Proviso State Bank*, 81 Ill. App.3d 1057, 36 Ill.Dec. 939, 401 N.E.2d

1077, 1083 (1980). We therefore review the record to determine whether the trial judge properly applied this standard in denying TWA's motion.

In order to prove fraudulent misrepresentation under Florida law, Crossman was required to show the following by a preponderance of the evidence:

1. A misrepresentation of existing material fact, or alternatively, a promise of future conduct with a present intention not to perform the promise;
2. That the person making the representation knew or should have known that the representation was false or made the representation without any knowledge as to its truth or falsity;
3. That the misrepresentation was knowingly made with the intent to induce the plaintiff to rely on the statement;
4. Injury to the plaintiff as a proximate result of his reliance on the misrepresentation.

*Albertson v. Richardson-Merrill, Inc.*, 441 So.2d 1146, 1149 (Fla.App.1983); *Ball v. Ball*, 160 Fla. 601, 36 So.2d 172, 177 (1948).

Count IV of Crossman's complaint alleged that TWA had promised not to "abandon" Crossman and to assist him in any dealings with the Saudi Arabian government. Crossman attempted to prove at trial that this promise was a fraudulent misrepresentation knowingly used to induce Crossman to accept employment with TWA, and that he was injured by relying on this representation. The evidence which Crossman presented at trial to support this claim included Crossman's testimony that Massie told Crossman and other prospective employees that "TWA would always be there should [they] ever need any assistance, that TWA would not abandon their American partners or people," testimony that TWA employees visited other American prisoners employed by TWA and Saudia but not Crossman, and testimony that the other American prisoners were incarcerated for five months while Crossman served eleven months in prison. Assuming that Massie's statement that "TWA would always be there should [employees]

ever need any assistance" was a promise as to a material fact made without any intention to later perform, and assuming that TWA knowingly used this statement as an inducement, the evidence at trial nevertheless completely failed to show that Crossman relied upon that statement to his detriment. *See Ball*, 36 So.2d at 177.

Crossman cannot argue that his arrest and confinement were the result of reliance upon Massie's statement; Crossman independently engaged in conduct which, believing his story, he felt was proper but which the Saudi Arabian authorities found suspicious enough to arrest him. Crossman's only argument that he was injured because of his reliance on TWA is that TWA prolonged his period of incarceration by failing to assist him. In support of this contention, Crossman cites the testimony of TWA employee Garth Smith, who testified that TWA had "pushed" a criminal case through the Saudi Arabian criminal justice system. The only specific evidence of how TWA could accomplish this "pushing" indicated that TWA could monitor the progress of documents relating to a criminal case from one office to another to ascertain whether these documents were actually being processed.

Construing the evidence in Crossman's favor, we find that the jury could have reasonably believed that TWA did not monitor the progress of Crossman's case through the Saudi Arabian criminal justice system as closely as it monitored the cases of the other three arrested employees. Nevertheless, the only evidence tending to show that TWA's lesser effort lengthened Crossman's incarceration was testimony that the three Americans arrested for distilling alcohol, whose cases TWA monitored more closely, were released after five months incarceration while Crossman served eleven months in prison. Crossman presented no evidence to show that the offenses of distilling alcohol and theft generally merit the same or similar sentence in Saudi Arabia. Similarly, no evidence showed that alcohol distillers generally serve more than five months in prison, or that persons found "chargeable" with thievery generally serve less than eleven months in prison.

Crossman emphasizes that the other three Americans were released earlier despite the fact that they all pleaded guilty while Crossman maintained that he was not guilty throughout his incarceration, but we fail to see how this supports his contention. In addition to the absence of evidence as to the points just noted, Crossman presented no evidence that persons who plead guilty receive harsher sentences in Saudi Arabia or that their cases proceed more slowly through the Saudi Arabian criminal justice system.

Contrary to his contention that closer monitoring of his case by TWA could have shortened his stay in prison, Crossman testified that he was in frequent contact with United States embassy personnel who did follow the progress of his case and attempted to assist him. Crossman does not contend that TWA could have done more to assist him than that which was actually done by the United States government and presented no evidence to that effect at trial. Quite simply, the fact that three Americans spent less time in jail for a different offense is in no way sufficient to permit a finding that TWA's inaction lengthened Crossman's term of imprisonment. Thus, we conclude that Crossman failed to present any evidence that he was injured due to his reliance on TWA's alleged promise to assist him. Therefore, we reverse the trial judge's denial of TWA's motion for judgment n.o.v.

Because we reverse the denial of a motion for judgment n.o.v., we consider whether any grounds that might warrant a new trial exist. *Neely v. Eby Construction Co.*, 386 U.S. 317, 328–29, 87 S.Ct. 1072, 1079–80, 18 L.Ed.2d 75 (1967). Crossman did not request a new trial in his brief in the event this Court reversed the district court and has presented no reasons why a new trial should be ordered. Our review of the trial record convinces us that no such grounds exist. Accordingly, the judgment

below is reversed, judgment n.o.v. is entered for TWA, and the jury's award of $75,000 to Crossman is vacated.

REVERSED.

CUDAHY, Circuit Judge, dissenting:

I cannot agree that "the evidence, when viewed in its aspect most favorable to [Crossman], so overwhelmingly favors [TWA] that no ... verdict [for Crossman] ... could ever stand." *Szarat v. City of Chicago,* 117 Ill.App.3d 809, 813, 73 Ill.Dec. 324, 327, 454 N.E.2d 68, 71 (1983). The majority contends that, given fraudulent misrepresentations by TWA, there was no detrimental reliance by Crossman. Seemingly, the majority's logic is that Crossman's incarceration resulted from his own conduct, not from any reliance on TWA's promises, and that TWA could not have shortened or ameliorated his imprisonment. This analysis, of course, does not address the possibility that Crossman would not have gone to Saudi Arabia at all had not TWA promised to "always be there should [employees] ever need any assistance."

In addition, while TWA *may* not have been able to shorten Crossman's ordeal or make him more comfortable, *had it tried,* it did not try. Under these circumstances, I think the jury might have been permitted to infer that TWA's inaction contributed to Crossman's injury. TWA, for example, might have pressured Saudia to drop any charges.

The majority seems to suggest that the plaintiff's problems were caused, not by TWA's nonfeasance, but by his own misbehavior. But Crossman has not admitted any wrong nor has he been convicted of any offense by an American or by a Saudi court. Hence, the majority's apparent assumption of misbehavior is unwarranted. There is no basis for setting aside the jury verdict. Hence, I respectfully dissent.

* Since this action never progressed to the stage where defendants were served with summonses, the United States Attorney was granted leave to