**John A. VERTES and Ernestine W. Vertes, his wife, Plaintiffs,**

v.

**G A C PROPERTIES, INC., a corporation formerly known as Gulf American Land Corporation, Defendant.**

No. 70–416–Civ.

United States District Court, S. D. Florida. Miami Division.

Jan. 26, 1972.

Robert M. Brake, Coral Gables, Fla., for plaintiffs.

Harold L. Ward, Miami, Fla., for defendant.

### FINAL JUDGMENT AND MEMORANDUM OPINION

KING, District Judge.

THIS CAUSE came on before the Court for trial without jury, on the Complaint of Plaintiffs, the purchasers in four contracts for the sale of land, for rescission of those contracts. Jurisdiction of this Court was obtained under 28 U.S.C. § 1332 on the grounds of diversity of citizenship in that Plaintiffs are citizens and residents of the State of Pennsylvania; the Defendant is a Florida corporation having its principal place of business in Dade County, Florida; and the amount in controversy is in excess of $10,000 exclusive of interest and costs.

### FINDINGS OF FACT

The Plaintiff, JOHN A. VERTES, is 64 years of age and is a crane operator employed by Westinghouse in one of its factories in Philadelphia, Pennsylvania. The Plaintiff, ERNESTINE VERTES is his wife, is of a similar age, and is employed by the telephone company in Philadelphia. Neither Plaintiff has had any experience in buying and selling land except for the purchase of their home and a small parcel of land in Pennsylvania. Although, at one time, they operated a small restaurant in addition to their other employment, their experience in the world of business and financial affairs has been limited.

Defendant was formerly known as GULF AMERICAN CORPORATION. It has been engaged in the large scale subdivision of Florida lands and sales at retail of the subdivided parcels. Its officers, directors and salesmen have had extensive experience in the land sales business.

In 1963 and 1964, Plaintiffs signed four contracts to purchase four separate parcels of land from Defendant based upon statements made by Defendant's sales representatives as to the value of said property at that time, and its potential uses and value. Defendant did not contest Plaintiffs' evidence, which showed that at the time the contracts were executed the value of the land was only a small fraction of the purchase price and that at the present time, eight to nine years later, the land value is far less than the purchase price. The contracts and values are as follows:

| Contract Number and Date | Value on Contract Date | Contract Price | Present Value |
|---|---|---|---|
| 064744 Jan. 7, 1963 | $230.00 | $4,664.00 | $2,500.00 |
| 324016 May 1, 1964 | 250.00 | 9,175.00 | 1,000.00 |
| 330389 Nov. 25, 1964 | 500.00 | 8,315.00 | 750.00 |
| 330390 Nov. 25, 1964 | 250.00 | 5,940.00 | 2,000.00 |

The circumstances surrounding the sales were such as to divert and stifle any attempt by the Plaintiffs at a critical analysis of the various transactions, and false statements of fact were made.

Plaintiffs received mailed invitations to sales dinners held by Defendant in Philadelphia, Pennsylvania. They attended the first dinner in late December, 1962 or early January, 1963. At that time they signed contract number #064744 for lots in Cape Coral. The second meeting was held some time in April or May of 1964, when Plaintiffs signed contract number #324016 for a business lot in Golden Gate Estates.

The format of both meetings was similar. When Plaintiffs arrived at the restaurant they were seated at a table with a salesman. The table was furnished with booklets bearing titles such as "How To Make Money from Florida Acreage" and "Your Golden Gate Way to a Prosperous Future," and other advertising matter.

When the meeting began the Sales Manager would make a welcoming speech and dinner would be served. During dinner the salesman at each table would engage in conversations designed to elicit information to determine which persons were the most likely prospects and to es-

tablish "an atmosphere of confidence." At one dinner, Plaintiffs were asked to fill out a questionnaire to determine their buying power.

After dinner, Defendant screened a movie featuring prominent sports celebrities and showing building and recreational activities in Florida. The movies were interrupted for a slide presentation showing general statistics of Florida's growth. Included were quotations from prominent historical figures concerning the advisability of owning land and its almost constant appreciation in value.

After the movies and slides the Manager would turn the prospects over to the salesman who would start with the most likely prospect. The salesmen were instructed to, and did, emphasize the prospect of increased value of the land to be sold, and the probability of profit on resale. Plaintiffs were told that the selling price was the fair market value of the property, and that they would be able to resell at a profit in a few years. The disparity between the market values and sales prices of the properties is apparent from the facts hereinabove set forth.

Each meeting had an allocation of specific lots from Defendant's Miami office. When a prospect indicated an interest in a particular lot the salesman would jump up and shout to the manager to, "Put a hold on [the lot under consideration]." The Manager would acknowledge a "hold" for five or ten minutes. At the end of that time, he would shout to the salesman to inquire whether he should remove the "hold" and the salesman would renew pressure on the prospect to sign. When a person signed a contract to buy a lot, the sale was publicly announced and at one meeting a button was put on the purchaser's coat. The purpose of all these showmanship techniques was to create an "atmosphere of urgency."

At the first dinner Plaintiffs were told that the Cape Coral lot was on a canal which had access to navigable waterways and which would allow them to dock a boat at their property for use in such waterways. Although the lot is on a canal, there are dams a short distance away, blocking access to navigable waterways. Plaintiffs were also told that their land contract would be paid up in full within six years. Although the payments on this contract have never been reduced there presently is more than $400.00 principal due on the contract, approximately nine years after its date.

At the second dinner Plaintiffs were told that the business site was in the path of development of the City of Naples and that the projected population growth was such that demand for their land in from three to five years would permit them to sell between thirty and forty building sites and "make a fortune." In fact, the land is not in the path of development of Naples and is, instead, in The Big Cypress Swamp.

Plaintiffs entered into contracts #330389 and #330390 while at Golden Gate Estates, Collier County, Florida. They and many other prospects for sales were flown to Florida in a plane chartered by Defendant. On arrival in Florida late on a Friday afternoon Plaintiffs were put on a chartered bus and taken to a motel owned by Defendant and located at Golden Gate Estates in an isolated area of Collier County. Once at the hotel they were given a schedule of events and a book of coupons for various events most of which were connected with sales promotion, and all of which so controlled the activities of Plaintiffs that practically every moment they were in Florida, was kept occupied by Defendant. There was no independent transportation to allow Plaintiffs to make their own inspection of the land being sold.

On Saturday, a salesman took Plaintiffs sightseeing in the Naples area, all the while extolling the rapid growth of the area and the advisability of buying land. Plaintiffs were shown condominium apartments in the City of Naples selling for $85,000 to $100,000 and were told that similar income property was available among Defendant's properties. At one time they were told that Defendant's property was part of the City of

Naples. Plaintiffs were then taken back to Defendant's headquarters and subjected to a high pressure sales conference. The salesman suggested they buy a single family lot which he represented to be next to a Golf Course. The salesman stated that this property, the subject of contract #330389, could also be subdivided and that the growth of population would make such subdivision feasible within the next few years.

Plaintiff then asked about an apartment site for investment. He was at first told that all of the apartment sites had been sold, but the purported supervisor of his salesman stated that he "just had a cancellation" and that an apartment site was available which could also be subdivided in a few years. Plaintiffs purchased this lot in contract number 330390.

Upon asking to see the property they had purchased, Plaintiffs were told that there was not sufficient time to drive them to the site. Instead they were given a short airplane ride and the pilot told them that their land was "down there." Plaintiffs then had their evening meal, stayed overnight at Defendant's motel, and after church services the next morning were flown back North.

Contrary to the statements of the salesman, the population growth of Collier County was not towards the area involved in the two foregoing contracts and this area presently remains unpopulated. The single family lot is neither next to nor anywhere near a golf course and the "apartment site" was and remains zoned for single family residential use. The present fair market value of the land is still far below the contract prices as set forth hereinabove.

Sometime during the next year (1965), Plaintiffs again met Ed Burke, the salesman who had sold them the business site at the second dinner in Philadelphia. Mr. Burke was at this time working for another land sales firm offering land on Grand Bahama Island in competition with Gulf American's sales of land in Florida. Mr. Burke casually mentioned to Plaintiffs that he had been to Florida and had

seen Golden Gate Estates and that the property or its development did not seem to be quite as represented to Mr. Burke by Gulf American while he was selling property for them. The Plaintiff, John Vertes, stated that he hoped that this was not the case and the subject was dropped.

During the early part of 1968, Plaintiffs drove to Florida and sought to inspect the property they had purchased. Unable to find the properties even after having been given oral directions by Defendant's personnel, Plaintiffs then consulted independent real estate brokers in Ft. Myers and Naples, Florida, and found out that the properties had market values considerably less than the contract prices. They consulted an attorney in Naples and sought to obtain a rescission of their contracts and repayment of the amounts they had paid to Defendant. They also listed the properties for resale but did not receive any offers to purchase the property. Thereupon, Plaintiffs filed this suit for rescission.

## CONCLUSIONS OF LAW

■ ■ Actionable fraud may be defined as a misrepresentation of a material fact, known to be untrue and made for the purpose of inducing another to act, upon which the other in fact relies to his detriment. Sutton v. Gulf Life Ins. Co., 138 Fla. 692, 189 So. 828 (Fla.1939); Nantell v. Limwick Construction Company, 228 So.2d 634 (4 D.C.A.Fla.1969); Robbins v. Gould, 278 F.2d 116 (5 Cir. 1960). An equitable action for rescission may be brought by one who has been fraudulently induced to enter a contract for the purchase of realty, Norris v. Eisenberry, 103 Fla. 104, 137 So. 128 (1931).

■ The Court must determine whether in this cause the representations made by the Defendant were of a type which may be a proper basis for rescission. Normally, it is only a statement as to existing or past material fact, as opposed to statements of opinions or value, which entitle one to relief. Williams v. McFadden, 23 Fla. 143, 1 So. 618 (1887);

Allen v. United Zinc Co., 64 Fla. 171, 60 So. 182 (1912); Hufstetter v. Our Home Line Ins. Co., 67 Fla. 324, 65 So. 1 (1914); Farnham v. Blount, 152 Fla. 208, 11 So.2d 785 (1942). Under this test there is a basis for the rescission of each of the four contracts.

■ As a material inducement for entering the first contract Plaintiffs were told that their lot was on a canal having access to navigable waterways and further that the contract payments would amortize completely within six years. As stated hereinabove both of these representations were false, the canal having dams to prevent the desired access and the contractual payments continuing to show a substantial balance some nine years after inception.

■ Plaintiffs signed the second contract in reliance upon the Defendant's representation that the Golden Gates Estates business site was in the path of development of Naples. As previously set forth the property was not in said path and was in fact located in the swamp.

■ In contracting for the third parcel of land Plaintiffs relied upon the Defendant's representation that the property was in the path of development and adjacent to a golf course. Both of these representations were false.

■ Finally, as a material inducement to entering the fourth contract Plaintiffs were told that the property was likewise in the path of development and moreover that this was an apartment site. Once again the property was not in the direction of population growth and rather than being suitable for apartment development was and is zoned for single family use.

The Defendant's numerous statements as to the fair market value of the properties, although not normally a basis for rescission, are added grounds for equitable relief in the case at bar. The reasons underlying the general rule that statements of value are not a proper basis in an action for fraud are set forth in the early case of Williams v. McFadden, 23 Fla. 143, 1 So. 618 (1887). In that case the Florida Supreme Court citing in pertinent part from Gordon v. Parmelee, 2 Allen 212 stated that "[A]ffirmation concerning the value of land . . . are, after all, only expressions of opinion, or estimates founded on judgment, about which honest men might well differ materially. . . . [T]hey furnish no evidence of any fraudulent intent. They relate to matters which are not peculiarly within the knowledge of the vendor . . ." *Williams,* supra at 620.

■ Where the foregoing rationale is inapplicable, that is, where statements of value are made by persons with superior knowledge or where such statements are made in connection with other fraudulent misrepresentations, relief will be afforded. The following statement appears in Willis v. Fowler, 102 Fla. 35, 136 So. 358 (1931):

. . . Where one of the parties to a contract of sale is in possession of exclusive or greatly superior knowledge of the value of the subject-matter as where an officer of a corporation, with full knowledge, makes a statement to a prospective purchaser of its stock, a mere member of the general public, as to what the stock is worth, his statement will be regarded as the statement of a matter of fact, rather than opinion, and, if false and fraudulent, the sale may be rescinded. (Citations omitted) If the seller of property, in addition to stating its value, states material facts within his particular knowledge, which he wishes to impress on the purchaser as demonstrating what the property is worth, and which are calculated to do so, his mere assertion as to value may be the expression of an opinion, but if his representations as to such material facts are false and fraudulent, they will afford ground to avoid the contract (Citations omitted). Id. at 366.

See Also: Robson Link and Co. v. Leedy Wheeler and Co., 154 Fla. 596, 18 So.2d 523 (1944); Vokes v. Arthur Murray, 212 So.2d 906, 28 A.L.R.3d 1405 (2d D.C.

A.Fla.1968); Ramel v. Chasebrook, 135 So.2d 876 (2d D.C.A.Fla.1961).

■ Defendant herein is a sophisticated real estate marketing organization while Plaintiffs are relatively inexperienced in business matters of any kind. Rather than mere puffing, the Defendant's statements as to value were the logical extension of their numerous other misrepresentations. The misrepresentations as to the canal, the golf course, the apartment site, and the direction of population growth merely laid the basis for the misrepresentation as to value.

■ Defendant argues that Plaintiffs are guilty of laches as a matter of law because in 1965, Defendant's former salesman, Ed Burke, told Plaintiffs that he had visited the property in Florida and that he believed the property "might not be as represented to him" by the Company, and thus by him to Plaintiffs. Mr. Burke was a salesman for a competing company at the time he made the foregoing vague and general remarks. His statements were not such as should have put Plaintiffs on notice as to the fraud practiced upon them.

Plaintiffs have asked for a rescission of these contracts and the parties have stipulated that Plaintiffs have paid to Defendant the total sum of $23,241.00, including principal and interest. Because the contracts have never been recorded, Defendant is still the record title holder to said lots. It is, therefore,

Ordered and adjudged that the four contracts hereinabove described between Plaintiffs and Defendants be and the same are hereby rescinded, and that Plaintiffs shall recover of and from the Defendants the sum of $23,241.00, together with interest from the date hereof and costs to be taxed hereinafter by this Court. Upon the payment of said sum by Defendant to Plaintiffs, all of the right, title and interest of Plaintiffs in and to said property described in said contracts shall terminate and Plaintiffs shall be enjoined and restrained from making any further claim against De-

fendant or to or for said lands as a result of said Contracts. The Clerk of the above styled Court is hereby directed to enter Judgment upon this Opinion and for the taxable Court Costs incurred in this cause in accordance with the Federal Rules of Civil Procedure and this Judgment.